UNITED STATES v. OREGON STATE MEDICAL SOCIETY, et al.

Civ. No. 4255.

United States District Court
D. Oregon.

Sept. 28, 1950.

104

Philip Marcus, Sp. Asst. to the Atty. Gen., Isidore Cohen, Washington, D. C., and Gerard G. Galassi and Robert H. Weinstein, Sp. Attys., U. S. Dept. of Justice, Seattle, Wash., for plaintiff.

Nicholas Jaureguy (of Cake, Jaureguy & Tooze), and John J. Coughlin (of Griffith, Peck, Phillips & Coughlin), Portland, Or., for all defendants.

Bruce Spaulding of Salem, Or., George L. Hibbard of Oregon City, Or., Manley B. Strayer of Portland, Or., A. N. Orcutt of Roseburg, Or., Lawrence T. Harris of Eugene, Or., John H. Carson of Salem, Or., C. S. Emmons of Albany, Or., and Otto J. Frohnmayer of Medford, Or., for certain defendants at early stages of the case.

McCOLLOCH, District Judge.

My work as a trial judge does not permit the preparation of a formal opinion in so complex a case. I will state my conclusions on the main issues and then will append some notes made at various stages throughout the trial. These may be of aid to counsel in the preparation of Findings of Fact and Conclusions of Law to be submitted as a basis for final judgment.

Government Contentions *

The Government contends (1) that defendants, beginning about 1936, conspired

---

* See complaint attached as Appendix A.

to restrain and monopolize prepaid medical care "in the State of Oregon"; (2) that "each of the medical societies" (Oregon State Medical Society and eight county and regional societies) "attempted to restrain and monopolize prepaid medical business in areas where they operated"; and (3) that "each of the medical societies (Oregon State Medical Society and eight county and regional societies) did restrain and monopolize prepaid medical business in areas where they operated".

I hold that none of the Government's charges have been proven by a preponderance of the evidence.

## The Time Factor

The Government presents its case against the Doctors under four time headings: 1930-1936; the year 1936; 1936-1941, and 1941 to date.

I prefer to group the controlling events into two periods: (1) Prior to the organization of the Doctors' own statewide plan in 1941, and (2) from the organization of the Doctors' plan (Oregon Physicians' Service) in December 1941 to date.

During the first period the Doctors were fighting defensively. They were quarreling among themselves and their chief antagonist exploited their dissension. This is the period of expulsion of doctors from medical societies—an unhappy and unfortunate period. Only death of the parties will close all the wounds that were made at that time. This period is ancient history. It has no legal or causal connection with the period 1941 to date, following the organization of Oregon Physicians' Service.

The fatal weakness of the Government's case I feel is the attempt to tie the periods 1936-1941 and 1941 to date together.

## The Question for Decision

The question then left for determination is whether the Oregon doctors in the formation of their own prepaid nonprofit organization, OPS, have violated the antitrust laws. As competitors of the privately-owned-for-profit organizations in the same field, have the doctors transgressed the bounds of legitimate competition? I hold that they have not.

## The Period 1936-1941

This was the period when the Doctors were trying to find themselves. It was a defensive period. The Doctors felt they were being exploited. They were trying to maintain their professional standards. They felt the doctor-patient relationship was being destroyed. It was a period of groping for the correct position to take to accord with changing times. The Doctors sponsored their own prepaid plan (Multnomah) and then repudiated it. What the Doctors did during this period was not conspiracy.

## The Period 1941 to Date

I really doubt that the Government believes the operations of Oregon Physicians' Service are monopolistic. Its two chief competitors are tremendously profitable; they have the cream of the business, going only into selected areas, whereas OPS must go everywhere and has many other weaknesses inherent in cooperative enterprise.

I hold that *Oregon Physicians' Service* is not a conspiracy but, rather, an entirely legal and legitimate effort by the profession to meet the demands of the times for broadened medical and hospital service, eliminating the evils of privately owned concerns, as well as the element of private profit.

## Are the Professions Exempt from the Sherman Act?

This question has been reserved by the Supreme Court. United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 492, 70 S.Ct. 711. I discuss the question in the Notes that follow.

## Interstate Commerce

I am assuming (without deciding) that interstate commerce is involved in this case.

## Findings on Controlling Issues

I will make a finding that the defendants did not conspire to restrain and monopolize prepaid medical care in the State of Oregon. Compare Paramount Pest Control

Service v. Brewer, 9 Cir., 170 F.2d 553; Id., 9 Cir., 177 F.2d 564, where the trial court was directed to make a finding as to the existence of conspiracy.

I will make a finding that defendant medical societies did not attempt to restrain and monopolize prepaid medical business in areas where they operated by express agreement or concert of action within their own groups or with third parties.

I will make a finding that defendant medical societies did not in fact restrain and monopolize prepaid medical business in areas where they operated by express agreement or concert of action within their own groups or with third parties.

I will make a finding that defendant doctors and medical societies have not restrained or sought to restrain the use of hospital facilities by others, except in cases of lawful and legitimate professional discipline of individual doctors for unprofessional conduct detrimental to their patients, to the hospitals and to the public generally.

The Government says, regardless of motive, if the necessary result of action is monopoly, the statute applies. But I find (1) that the motive (intent) of defendants was not to restrain or monopolize and (2) that monopoly did not in fact result and does not exist. Nor does unreasonable restraint exist.

I will make a finding that if there was a conspiracy, as alleged by the Government, the thread was broken and the conspiracy ended when a large percentage of Oregon doctors entered the Armed Forces in the period 1941–1945.

I will make a finding that if there was conspiracy, as alleged, the thread was broken and the conspiracy ended when the organized doctors of Oregon reversed their position in 1941 and engaged in contract practice through the medium of their own organization, Oregon Physicians' Service. If the doctors had previously been conspirators, they then became competitors, competing with the existing privately owned and operated prepaid medical care organizations.

I will make a finding that OPS and the doctor-owned county and regional plans are business competitors with the privately owned profit making organizations and that, as competitors, the doctors have conducted their organizations fairly and well within the legal limitations of competitive business practice. For legitimate competitive practices see Prosser on Torts, p. 1020, et seq.; Restatement of Torts, § 765; and see decision of L. Hand, J. in United States v. Associated Press, D.C., 52 F.Supp. 362, 368 and following pages.

I will make a finding and/or conclusion that the practice of medicine is not a trade within the meaning of the Sherman Law, 15 U.S.C.A. §§ 1–7, 15 note.

### Findings on Subsidiary Issues.

#### Rule of Reason.

Years ago the Supreme Court applied the "Rule of Reason" to anti-trust prosecutions. Standard Oil Co. of N. J. v. The United States, 1917, 221 U.S. 1, 31 S.Ct. 502, 55 L. Ed. 619. I will make a finding that the restraint of trade (if any) in this case was and is not unreasonable. I do not include in this fee fixing for, as I state in Note 7, if doctors are held to be engaged in a trade, they cannot "fix fees" under the Supreme Court's decisions. Incidentally, the privately owned hospital associations fix fees and they are engaged in a trade. American Medical Ass'n v. U.S., 317 U.S. 519, 63 S. Ct. 326, 87 L.Ed. 434.

#### The Purpose of Oregon Doctor-Owned Plans

I will make a finding that OPS and the various county or regional doctor-owned or doctor sponsored prepaid medical plans were not formed to eliminate or restrain organizations already in the field; on the contrary, they were formed to meet the social need which had arisen for group medical care, eliminating the element of private profit, over and above legitimate hospital and medical charges.

*On the importance of motive in modern law, see Prosser on Torts, p. 29, et seq.[1]

#### "Taking Tickets"

---

1. The sentences marked *, and most of the annotations have been added since the opinion was filed.

I will make a finding that there is no present conspiracy, combination, agreement or concert of action among doctors not to "take tickets" of privately owned hospital associations.

I will make a finding and/or conclusion that refusal to "take tickets" of privately owned associations is not boycott.

*Boycott*

I will make a finding and/or conclusion that defendants have not in recent times (if ever) boycotted privately owned hospital associations, and that they do not, so far as the evidence or legitimate inferences show, intend to boycott privately owned hospital associations in the future.

*For an interesting discussion of what boycott is, see Prosser on Torts, p. 1027, n. 44.

*Restraint on hospitals* was alleged but nothing substantial offered in proof.

Notes

Note 1. *Restriction (?) of Prepaid Coverage.*

A greater per cent. of Oregon covered by prepaid plans than in any other state. (p. 455 Government's brief.)

Note 2. *This is not Monopoly.*

Only 120,000 out of 1,510,000 people in the state belong to OPS.

Note 3. *Hard to Follow.*

The Government charges that OPS is engaged in a conspiracy to monopolize *state-wide* prepaid medical care, but OPS is criticized because it does not go into certain counties.

Note 4. *"Allocation of Territory".*

Obviously, two doctor-sponsored plans, one statewide, the other local, could not operate in Klamath County, to take an instance. If the needs of the public are adequately taken care of in a particular county through the activities of local physicians, the profession's duty as to prepaid medical care in that particular county is fully discharged. On this point, the Government has fallen into absurdity. Apparently it says OPS should use X county physicians to compete with X county physicians.

Note 5. There is frequent reference in the Government's brief to the "economic aspect" of the defendant doctors' activities.

It was said, "The Laborer is Worthy of his Hire."

* "Nor would you say that medicine is the art of receiving pay because a man takes fees when he is engaged in healing? "Certainly not." (The Republic, Book I)

Note 6. *Fee Fixing "Activities."*

This expression is used in the Government's brief. Is supervision of fees within a profession unlawful? Barbers do it, bricklayers, beauty operators, milk men. Compare United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 496, 70 S.Ct. 711, Jackson, J., dissenting.

Note 7. *Fee Fixing.*

Of course, if the professions are trades, then fee schedules become (under Supreme Court decisions) *per se* unlawful. United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711.

The question of fee fixing has become academic in the present case, because the case revolves around the legitimacy of the operations of the doctors in competition with the privately owned plans. The Government concedes the right of the doctors to compete in this field, and the fixing of fees is of the essence of all prepaid plans, whether doctor-owned or privately owned.

Note 8. *Power.*

"The Government" in Sherman Act prosecutions is the particular group in charge of the anti-trust department of the Department of Justice at the time, and the type of prosecutions brought in a given era reflect the economic and social views of those in power at that time. Instance: Attempt, by Assistant Attorney General Arnold to subject Organized Labor to the anti-trust laws. United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; discussed in Pritchett's "The Roosevelt Court", beginning at p. 212.

108

* "The Government i. e. certain jobholders." H. L. Mencken Chrestomathy (1949) p. 345.

Note 9. *"The Sherman Act Means What the Courts Say It Does."*

The Supreme Court has held that Organized Labor does not come under the anti-trust laws. This was court-made law.

Can it be justly held that Congress intended to include the professions when it enacted the Sherman law in 1890? The American Medical Association had been in existence 43 years. The American Bar Association was organized in 1878.

*The charging part of the original Act, sections 1 and 2, consists of 75 words. The Digest of Decisions construing and applying these sections, 15 U.S.C.A. §§ 1–7, 15 note, covers 150 pages.

Note 10. *Variable National Policies.*

During the late war, exemption from the anti-trust laws was given to large enterprises in order to attain maximum production of vital materials.

Legislation just enacted (9/23/50) appears to authorize exemptions during the present Korean crisis.

N. R. A. was an interesting aberration. The oil companies pleaded unsuccessfully that they were only doing what they had been encouraged to do under N. R. A. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129.

Note 11. *Court-made Policies.*

A keen analyst has said the Sherman Act "suffered from bad draftsmanship." G. Henderson, "Federal Trade Commission" (1924). That this is a broad field for court-made law was the observation of Judge Learned Hand in the recent New York communist cases. United States v. Dennis, 2 Cir., 183 F.2d 201, 215, 2d col.; and see the Associated Press case, D.C., 52 F.Supp. 362.

Note 12. *The Age of the Common Man.*

In a measure, this case is an attack on the professions. Everything critical of the doctors that has been said in the case could be said of the legal profession.

The World Revolution that we hear about allows no place for the professions. All that is principle, dignity, the efforts of the ages to create an aristocracy of intellect—these are to be destroyed in the interest of "the common man."

He will be "common", indeed, without professions, in the society that he is to rule.

*And see Mencken, "Notes on Democracy", pp. 3–9.

Note 13. *Self-preservation.*

Leaders among the doctors maintain the view that doctor owned prepaid medical plans are the profession's answer to socialization.

Can it be that a profession may not defend itself by reorganization of its methods, by doing within the profession, what has been compelled elsewhere by law; that, thus, to reorganize, and seek to preserve its independent status makes an organized profession and its leaders criminals and subject to the injunctive power of the courts?

In short, that organized medicine must remain a sitting duck while socialism overwhelms it? I would not expect an American court to hold that.

*Re *socialization* see a new book "The Key to Peace" by Dean Clarence Manion of the School of Law, Notre Dame University. Though recently published, Dean Manion's work has been accepted as a great book.

Note 14. *Socialized Medicine* may overtake them but the doctors claim the right to save the profession from socialization. That is what this case is about, from the doctors' viewpoint. As to this defense, it must be conceded that the purpose with which action is taken is of prime importance under the Sherman Act. United States v. Yellow Cab Co., 338 U.S. 338, 70 S.Ct. 177.

Note 15. *Constitutional Democracy* is not a one-way road. Those seeking changes,

radical or otherwise, may urge them. Those who believe in things as they are, or who seek to retain them in modified form may oppose radical change, without becoming subject to the criminal laws. That certainly includes vitally interested parties whose way of living, whose living itself, is threatened. This is entirely aside from considerations of public interest.

I may be the most despicable person in the community and, having great wealth, put it to entirely anti-social uses. Under our system, I may fight for the right to continue my way of life.* Social forces, acting through the Government, may impinge on me, but I can oppose them with all my might. That is one of the issues in this case. What was the purpose of the doctors in organizing the Oregon Physicians' Service? Was it to obtain a monopoly in the prepaid medical field, or was it to save themselves and their profession from threatened socialization? I hold it was the latter, and that nothing in the anti-trust laws deprives them of the right to fight to defend their independent professional status. *That is entirely different from whether socialization can be lawfully forced on them.* Any other construction of the statute would raise the gravest questions.

Note 16. *Judge Learned Hand* said: "A monopoly of all those interested in an activity is no monopoly at all, for no one is excluded and the essence of monopoly is exclusion * * *. *If other services* (hospital associations in this case) *were incidentally driven out, that would not be an actionable wrong."* United States v. Associated Press, D.C., 52 F.Supp. 362, 374.

Membership in Oregon Physicians' Service is open to all doctors in good standing in a medical society, local or State. Query, under Judge Learned Hand's definition, if all doctors, members of medical societies, became members of O. P. S., would that be monopoly?

In this connection, I will make a finding that it has not been shown that at any time within recent years, has membership in any medical society been denied to a doctor because of his connection with a private hospital association.

Note 17. *The Legal Profession Next.*

"The trend and drift towards Socialized Medicine should be all the lawyer needs to recognize that Socialized Law is but the next step for those dedicated to the socialized-police state. * * *"

"The socialization of the law, if lawyers permit it to come about, will ultimately contribute more to the destruction of Democracy than any other thing that can happen. It can happen here!" (Quoted from Oregon State Bar bulletin, Hon. Alexander G. Brown, Editor, August, 1950.)

* "Another serious feature of the rise of the service state is its threat to the professions. By a profession we mean a group of men pursuing a common calling as a learned art and as a public service—none the less a public service because it may incidentally be a means of livelihood. Gaining a livelihood is not a professional consideration. The spirit of a profession, the spirit of public service constantly curbs the urges of that incident. An organized profession does not seek to advance the money-making feature of professional activity. It seeks rather to make as effective as possible its primary character of a public service. An engineer may patent his inventions. A manufacturer may get legal protection for his trade secret. What a member of a profession invents or discovers as to the art of his profession is not his property. It is at the service of the public. A tradition of duty of the physician to the patient, to the medical profession and to the public, a tradition of the duty of the lawyer to the client, to the profession, to the court and to the public, authoritatively declared in codes of professional ethics, taught by precept and example, and made effective by an organized profession, makes for effective service to the public such as could not be had from individual practitioners not bred to the tradition and motivated as in a trade

---

* For defense of one's business practices or status see Prosser on Torts, p. 1029. An interesting recent case is Moore v. Mead Service Co., 10 Cir., 184 F.2d 338.

primarily if not solely by quest of pecuniary gain. Nor can this professional tradition be replaced with benefit to the public by bureaus of physicians or bureaus of lawyers, holding public employment, owing primary allegiance to political parties and depending for advancement on the favor of political leaders. When every form of public service becomes a state function the difference between a public service performed by a profession and a public function performed by a bureau will become crucial.

"Again, if the professional idea is lost the great body of those holding minor positions in performance of public functions come to be thought of and to think of themselves as employees. Already municipal employees are becoming organized in trade unions. In Los Angeles the probation officers, whom we had been thinking of as members of a rising profession of social workers, are members of a probation officers' union, affiliated with a national labor organization. Teachers in the public schools have been unionized in more places than one and members of university faculties are now active in a teacher's union in some of our old historic institutions. Thus, as things are coming to be in an era of bigness, large-scale organization of all activities, and strenuous acquisitive self-assertion, the professional idea must contend with the rise to power of organizers of an expanding class of employees. *Unless we are vigilant it may well be that this prevailing of the trade idea will make straight the path toward absorption of the professions in the service state.* The course of that path is not hard to chart. We can see three stages as threatened. First, unionizing of all callings which may be taken to involve employment, at least so far as some in the calling are not capable of classification as employers; second, by government subsidies getting control of professional education and thus subordinating the professions to bureaucratic management; third, seeking to bring cheap and equal professional assistance to everyone's back door by government's taking over of the callings pursuing learned arts. Such a consummation may be pictured as a carrying of the idea of the service state to its furthest logical development. The service state began by performing a few major services. In time it has undertaken more and more. Now it assumes that all public service belongs to the state and is jealous of public service being performed by anyone else. The advocates of the omnicompetent state will say that in primitive and pioneer societies certain public services are rendered by anyone who seeks to try his hand on the basis of such qualifications as he deems sufficient. Later, as society advances, such services are rendered by well qualified practitioners organized in professions, the qualifications, as these professions develop, being prescribed and ascertained by governmental authority. Ultimately, it will be said, as political organization of society reaches maturity, all public services of every sort are to be exclusive governmental functions to be exercised by government bureaus. Indeed, the idea of a profession is incompatible with performance of its function, exercise of its learned art by or under the supervision of a government bureau. A profession presupposes individuals free to pursue a learned art so as to make for the highest development of human powers. The individual servant of a government exercising under its supervision a calling managed by a government bureau can be no substitute for the scientist, the philosopher, the teacher, each freely applying his chosen field of learning and exercising his inventive faculties and trained imagination in his own way, not as a subordinate in an administrative hierarchy, not as a hired seeker for what he is told to find by his superiors, but as a free seeker for the truth for its own sake impelled by the spirit of public service inculcated in his profession." Roscoe Pound "Law in the Service State", Dec., 1950, 36 A.B.A. Journal 979, 980.

Note 18. *Judge Wilkin* has pointed out the slowness of the legal profession to organize in the United States. The American Bar Association was organized in 1878.

It was unlawful in one of the Colonies to practice law. The cycle is that way again.

Note 19. *The Professions* are monopolies, but they are not *per se* unlawful because they are not trades. That they are monopolies; American Medical Ass'n v. United States, 76 U.S.App.D.C. 70, 130 F. 2d 233, 246.

Note 20. *Compliment to Government Counsel.*

I desire to compliment Mr. Marcus and his staff that they have not pressed in this case for a holding that professions are trades, but have been willing to rest their case on other grounds.

Note 21. *Slaves.*

Judge Robert N. Wilkin says Greek slaves were the physicians in Rome. To this he attributes the late rise of medicine as a profession, as compared with law. ("The Spirit of the Legal Profession", p. 157.)

*To the same effect: "The Romans took their medical information, and for several hundred years their physicians too, from Greece, as medicine was not deemed a fitting occupation by the master race." You and Your Heart (1950), p. 34.

* "Then I hid myself in my bed all a-tremble. Aesculapius did the round of the patients and examined them all with great attention; then a slave placed beside him a stone mortar, a pestle and a little box." (Translator's note—apothecary's outfit). Plutus, Comedies of Aristophanes.

Note 22. *Doctors* like lawyers, are not popular, but they have this advantage, they are an absolute necessity.

It was said in the last war every ship having a complement of one hundred men or more had a doctor (Compare Horatio Hornblower); on the battlefields a doctor was within reach of every wounded man.

Apparently lawyers reached the peak of their popularity early. (See Gibbon's great Chapter 44.)

*The Oath of *Hippocrates*

"I swear by Apollo the physician, and Aesculapius, and Hygeia, and Panacea, and all the gods and goddesses, that, according to my ability and judgment, I will keep this Oath and this stipulation—to reckon him who taught me this Art equally dear to me as my parents, to share my substance with him, and relieve his necessities if required; to look upon his offspring in the same footing as my own brothers, and to teach them this art, if they shall wish to learn it, without fee or stipulation; and that by precept, lecture, and every other mode of instruction I will impart a knowledge of the Art to my own sons, and those of my teachers, and to disciples bound by a stipulation and oath according to the law of medicine, but to none others. I will follow that system of regimen which, according to my ability and judgment, I consider for the benefit of my patients, and abstain from whatever is deleterious and mischievous.

"I will give no deadly medicine to any one if asked, nor suggest any such counsel; and in like manner I will not give to a woman a pessary to produce abortion.

"With purity and with holiness I will pass my life and practise my Art. I will not use the knife, not even to cut persons laboring under the stone, but will leave this to be done by men who are practitioners of this work. Into whatever houses I enter, I will go into them for the benefit of the sick, and will abstain from every voluntary act of mischief and corruption; and, further, from the seduction of females or males, of freemen and slaves. Whatever, in connection with my professional practice or not in connection with it, I see or hear in the life of men which ought not to be spoken of abroad, I will not divulge, as reckoning that all such should be kept secret. While I continue to keep this Oath unviolated, may it be granted to me to enjoy life, and the practice of the art, respected by all men, in all times! But should I trespass and violate this Oath, may the reverse be my lot!"

*Lawyer's Oath

(as administered in this Court)

"I do solemnly swear:

"I will support the Constitution of the United States.

"I will maintain the respect due to courts of justice and judicial officers.

"I will not counsel or maintain any suit or proceeding which shall appear to me to be unjust, nor any defense except such as I believe to be honestly debatable under the law of the land.

"I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law.

"I will maintain the confidence and preserve inviolate the secrets of my client, and will accept no compensation in connection with his business except from him or with his knowledge and approval.

"I will abstain from all offensive personalities, and advance no fact prejudicial to the honor or reputation of a party or witness unless required by the justice of the cause with which I am charged.

"I will never reject from any consideration personal to myself the cause of the defenseless or oppressed or delay any man's cause for lucre or malice.

"So help me God."

Note 23. *An Ohio Will.*

"Shun preasts of all orders, Drs. of all profession and lawyers of all grades. I don't include Surgerry with Doctors, and above all class that afflict humaity the lawyers is the worst."

Note 24. *Flexing Their Muscles.*

Union witnesses were offered by the Government to testify angrily that doctors would not give them itemized statements. I think the issue was magnified, but I was struck by the attitude of the men towards the professions.

Note 25. *Klamath Medical Bureau.*

A striking instance of local initiative is furnished by the Klamath County doctors. At a cost to themselves of $400,000, the Klamath doctors purchased and modernized two privately owned hospitals. They did this because hospital costs were too high under private management and the service was not adequate.

Needless to say, after this heavy investment, the Klamath doctors have their own local prepaid plan and for this, although not named as defendants, they are charged with being parties to the alleged statewide conspiracy to restrict medical care.

I have great difficulty in following the Government's criticism of county and regional doctor groups who have set up their own local prepaid plans. They are but discharging their duty to their own local people, it seems to me.

Is this what the Government wants: That doctors should leave the field to the privately owned companies? Certainly not that, for at the trial the Government lawyers conceded the right to the doctors to compete.

Note 26. *Some Quotes:*

"Loyalty to the client's interest is the highest duty of a lawyer. Socialization would destroy the independence of the Bar and create a loyalty above that owed to the client."

"The professional service of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between client and lawyer."

The above quotations sound very like the doctors' utterances that are condemned by the Government in this case. The quotations are from *1950* writings of the American Bar Association.

Canon 35 of the Canons of Professional Ethics of the American Bar Association provides:

"Intermediaries

"The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate which intervenes between client and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties by or in the interest of such intermediary. A lawyer's relation to his client should be personal and responsibility should be direct to the client. * * *"

### Note 27. *The A. M. A. Case.*

The present case represents an effort to apply the decision obtained against the American Medical Association (American Medical Ass'n v. U. S., 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434) to Oregon. The facts are different. The times are different.

### Note 28. *Amends to Dr. Moore and Others.*

Since doctors generally are now doing the same things for which they expelled their brothers in 1936 and years following, fair play suggests that amends, where possible, be made to those still living. Doctors expelled or who resigned under pressure from the medical societies should be restored to membership.

The foregoing findings and notes may be deemed and treated as Findings of Fact on factual matters and as Conclusions of Law on legal questions—to be supplemented by formal Findings and Conclusions if counsel deem it necessary or appropriate to submit further Findings and/or Conclusions for consideration.

Plaintiff's case was, at my request, argued fully at the end of the Government's testimony; and, having had the benefit of extended pre-trial hearings and exhaustive briefs, I have not felt the need for further argument.

Judgment of dismissal will at a later time be entered.

### Findings of Fact.

The above entitled cause came on for final hearing before the undersigned, one of the judges of the above entitled court, on the 18th day of October, 1949. Thereupon, after opening statements, evidence was introduced by the plaintiff and by the defendants and the trial was adjourned from time to time until the 11th day of February, 1950, when all parties rested, subject to certain further proceedings. The Court took said case under advisement and having considered a brief filed by plaintiff heretofore rendered its written opinion, findings and notes. Thereafter proposed findings of fact and conclusions of law were tendered by defendants and objections to said findings and conclusions and also proposed findings were offered by plaintiff.

The Court having considered all of said suggested and proposed findings and conclusions and said objections now makes the following:

1. Defendant Oregon State Medical Society is an unincorporated association, having its office and principal place of business in Portland, Oregon.

2. Defendant Oregon Physicians' Service is a corporation incorporated under the laws of the State of Oregon and having its office and principal place of business in Portland, Oregon. The Oregon Physicians' Service furnishes prepaid medical, surgical and hospital care on a prepaid contract basis. It is sponsored and approved by the Oregon State Medical Society. The great majority of its stockholders and participating physicians are also members of that society.

3. Defendants Clackamas County Medical Society, Clatsop County Medical Society, Columbia County Medical Society, Douglas County Medical Society, Jackson County Medical Society, Lane County Medical Society, Marion-Polk Counties Medical Society and Multnomah County Medical Society are unincorporated associations. Multnomah County Medical Society has an office and place of business in Portland, Multnomah County, Oregon. None of said other defendants has any office or place of business. Each of said defendants is to a limited extent affiliated with defendant Oregon State Medical Society.

4. Defendant W. W. Baum is a doctor at Salem, Oregon. He is a member of the Oregon State Medical Society, and has been an officer or director of one or more of defendant corporations or associations during all or part of the time alleged in the complaint.

5. Defendant John Besson is a doctor of Portland, Oregon. He is a member of the Oregon State Medical Society and has been on the Council of Oregon State Medical Society and of Multnomah County Medical Society during part of the times alleged in the complaint.

6. Defendant J. P. Brennan is a doctor at Pendleton, Oregon. He has been an officer or director of one or more of de-

fendant corporations or associations during all or part of the times alleged in the complaint.

7. Defendant John H. Fitzgibbon is a doctor at Portland, Oregon. He has been an officer of one or more of the defendant associations during all or part of the times alleged in the complaint.

8. Defendant Charles E. Hunt is a doctor at Eugene, Oregon. He has been an officer of one or more of the defendant associations during all or part of the times alleged in the complaint.

9. Defendant Gordon B. Leitch is a doctor at Portland, Oregon. He has been an officer or director of one or more of the defendant corporations or associations during a part of the times alleged in the complaint.

10. Defendant K. H. Martzloff is a doctor at Portland, Oregon. He has been an officer of one or more of the defendant associations during all or part of the times alleged in the complaint.

11. Defendant E. H. McLean is a doctor at Oregon City, Oregon. He has been an officer of one or more of the defendant associations during all or part of the times alleged in the complaint.

12. Various organizations in Oregon are engaged in the business of paying for or supplying medical care to individuals, groups of individuals, and business concerns on a contract basis.

13. Northern Permanente Foundation was organized some time subsequent to the 1st of January, 1942, and prior to the 1st of January, 1945, by the Kaiser shipbuilding organization. Shortly after the end of the war it was reorganized into a partnership of doctors, there being about seventeen such doctors in the partnership at the time of the trial of this case. Some of these doctors, members of the partnership, reside and have offices in Vancouver, Washington, and some of them reside and have offices in Portland, Oregon. Some of them are members of Clark County (Washington) Medical Society and some of them are members of Multnomah County (Oregon) Medical Society. The partnership enters into contracts with residents of Washington and also with residents of Oregon for the furnishing of prepaid medical care. It has an office in Vancouver, Washington, and an office in Portland, Oregon. It does not appear from the evidence whether contracts entered into with Oregon residents are written in the Portland, Oregon, office or in the Vancouver, Washington, office.

With this exception, no organizations with offices outside of Oregon offer to make or do make contracts with residents of Oregon for prepaid medical, surgical or hospital care or allied services. However, indemnity insurance companies incorporated in other states sell insurance policies in Oregon providing indemnity against expenses incurred for doctors' and hospital services, as stated in finding 35.

14. Organizations having their main offices in Oregon have sold prepaid medical care policies in the states of Oregon, Washington and California. Organizations doing prepaid medical insurance business in the State of Oregon use interstate transportation and transmission facilities to transmit across state lines policies, reports, instructions and correspondence, and reports and communications go between said Oregon organizations and agents, doctors and customers located in states other than Oregon. Medical care policies and payments thereon by policyholders have gone in interstate commerce between the State of Oregon and other states. Prepaid medical policies issued by Oregon organizations cover reimbursement for medical care required by Oregon residents while in other states. Said Oregon organizations arrange to pay for said medical care rendered by doctors, hospitals and others in other states. All of these transactions necessitate dealings between said Oregon organizations and individuals and organizations in other states.

15. Organizations engaged in the sale and furnishing of prepaid medical care in Oregon from time to time in connection with first aid supplies furnished by them, purchase and procure medicines, drugs, medical supplies and instruments shipped from other states into the State of Oregon.

16. Many industrial concerns located in Oregon are parties to contracts with organizations under which their employees secure prepaid medical care. Industrial concerns having places of business in some other states carry prepaid medical insurance for their employees with prepaid medical care organizations having their main offices in Oregon. Some of their employees reside in states other than Oregon.

17. Doctors practicing in Oregon treat patients who have come from other states to secure medical care in Oregon. Some of such patients are policyholders of Oregon prepaid medical care organizations. The facilities of hospitals located in Oregon are sometimes used by residents of other states who have come to Oregon for the purpose of using said facilities. Doctors in other states sometimes treat members of Oregon prepaid medical care organizations who are residents of the State of Oregon, and hospitals in other states are used by residents of Oregon, including some members of Oregon prepaid medical care organizations.

18. Medicines, drugs, medical supplies and equipment continuously come into the State of Oregon as the result of medical care by Oregon doctors and hospitals.

19. Unless doctors and hospitals in Oregon provide medical treatment to members of prepaid medical care programs, performance of contracts for prepaid medical care is made impossible.

20. None of the defendants, either at any of the times set forth in the complaint or at any other time, have attempted to, or have been engaged in any combination or conspiracy to, restrain or monopolize the business of selling or furnishing prepaid medical care in the State of Oregon or elsewhere; or to restrain or monopolize interstate trade or commerce in said business; nor do any of the defendants threaten or intend to do so.

21. There has been no conspiracy, agreement, combination or concert of action among the defendants during the times alleged in the complaint or at any other time (a) to monopolize or attempt to monopolize prepaid medical care business in the State of Oregon or between the State of Oregon and other states, or (b) to limit the scope of medical care to be provided by prepaid medical care plans in the State of Oregon, or (c) to prevent, hinder or obstruct prepaid medical care organizations other than those sponsored by defendants, or any of them, from continuing to engage in or from engaging in the business of selling or furnishing prepaid medical care in Oregon or elsewhere, or (d) to restrain residents of Oregon or other states from entering into or continuing under prepaid medical care plans not sponsored or supported by defendants, or any of them, or (e) to prevent doctors from cooperating in prepaid medical care plans not sponsored or approved by defendants, or (f) to restrict the use of hospital facilities by doctors cooperating in prepaid medical care plans other than those sponsored or approved by defendants, or (g) to prevent Oregon hospitals from allowing their facilities to be used by doctors or patients associated with prepaid medical care plans other than those sponsored or approved by defendants.

None of the defendants has conspired or combined or agreed or proceeded by concert of action or otherwise to restrain or monopolize trade or commerce in the manner or by the means charged in plaintiff's complaint, or otherwise.

22. Prior to 1941, some of the defendants advised doctors not to cooperate with commercial prepaid medical care organizations in certain practices engaged in by them, but such action on the part of certain of the defendants was not the result of any conspiracy or combination or attempt to restrain or monopolize the business of prepaid medical care, but was for the purpose of maintaining the standards of medical practice among the members of medical societies.

23. Prior to 1941, defendant Multnomah County Medical Society expelled certain members who were associated with certain types of contract practice and threatened the expulsion of other members so engaged, but such action by said defendant society was not the result of any combination, agreement or conspiracy in restraint of

116

trade or commerce or otherwise and was for the purpose of maintaining and advancing the standards of medical practice of members of said defendant society; and no other defendant has ever expelled, threatened or incited the expulsion from medical societies of any doctors because of any cooperation in prepaid medical care plans, and since 1941, none of the defendants has expelled, threatened or incited the expulsion from medical societies of doctors cooperating in medical care plans other than those sponsored by the defendants.

24. Defendants have formed and promoted certain prepaid medical care plans, but such action on the part of defendants was not pursuant to any conspiracy, combination or attempt to restrain or monopolize trade or commerce and was not with the intent to drive out, hinder and obstruct commercial prepaid medical care plans operating in the State of Oregon, but it was with the intention to compete with such commercial medical care plans; and such plans have not been driven out of the State of Oregon by defendants; and have not been hindered or obstructed, except as they may be affected by legitimate competition of plans sponsored by defendants.

25. None of the defendants at any time has interfered with or attempted or combined or conspired to interfere with commercial prepaid medical care organizations in obtaining hospital facilities for their members.

26. None of the defendants at any time has refused to treat patients or caused others to refuse to treat, or combined or conspired to refuse to treat any patients who were members of any prepaid medical care plan, or discriminated against any such patients by reason of such membership.

■ 27. None of the defendants has refused or encouraged other doctors to refuse, or conspired or combined to refuse, to give patients itemized statements to enable the patients to be reimbursed under any plan of prepaid medical care.

28. None of the defendants has refused to consult or assist, or encouraged others not to consult or assist, or conspired or combined to refuse to consult with, doctors who treat members of any prepaid medical care plan.

■ 29. None of the defendants has spread any false propaganda for the purpose of discrediting prepaid medical care plans not endorsed by defendants.

30. It has been the policy of the defendants either to furnish or to encourage others to furnish prepaid medical care throughout the State of Oregon. In counties where some local prepaid medical care plan operated by the local doctors has been in force, Oregon Physicians' Service has not attempted to interfere with any such plan and has not, with certain exceptions, sold prepaid medical care contracts in any such locality.

Oregon Physicians' Service was intended to be an agency, and has in fact been an agency, to provide a prepaid medical care plan in Oregon by a doctor-sponsored group in areas where such a plan had not yet been organized by the local doctors, and in cases where groups of patients live or work in more than one county; and in cases where the local doctors' plan has not yet provided for auxiliary contracts, such as "family contracts" or "individual contracts". Oregon Physicians' Service provides for medical and hospital care, in one form or another, in every county in Oregon. Most of the doctors participating in the local doctor-sponsored plans are also participating physicians of Oregon Physicians' Service.

No local plan of prepaid medical care sponsored by doctors of any county has attempted to sell contracts for prepaid medical care in other counties without the consent of the doctors in such other counties who would render the services provided in said contracts. The reasons for these policies are, first, that defendants believe that doctors should not attempt to sell the services of other doctors without their consent, and, second, competition between two doctor-sponsored plans in a single county is impractical, since the same doctors must render services under whatever plans are in operation. These policies and the carrying out of these policies have

not been a result of any conspiracy or combination in restraint of trade or commerce and have not resulted in restraining or monopolizing the business of selling or furnishing prepaid medical care.

31. None of the defendants has conspired, combined or attempted at any time to make hospital facilities in Oregon available only to members of defendant Oregon State Medical Society or its component county medical societies, nor have the defendants or any of them ever restricted or excluded other qualified doctors from the use of hospital facilities by others; there have, however, been members of one or more defendant societies who have sought to prevent the use of hospital facilities by other doctors, but only in cases of lawful and legitimate professional discipline of individual doctors for unprofessional conduct detrimental to their patients, to the hospitals and to the public generally, which conduct had no relationship to prepaid medical care business.

32. No act or conduct on the part of defendants has prevented or hindered prepaid medical care organizations in entering into or expanding their business in Oregon, except that defendants through prepaid medical care organizations sponsored by them have entered into lawful competition with prepaid medical care organizations other than those sponsored by them; nor has the business of any such organization outside the State of Oregon been impeded or impaired in its ability to do business by any conduct on the part of any of the defendants other than such competition.

■ 33. No act of the defendants has had the effect (a) of depriving any member of the public of a fair and free opportunity to acquire prepaid medical care insurance from organizations competing with one another in a free market, nor (b) of causing any members of the public to be deprived of medical care, nor (c) of causing business concerns to be deprived of any opportunity to obtain prepaid medical care insurance for their employees in an unrestrained market, nor has the business of any such business concerns been adversely affected by acts or conduct of

any defendants, nor (d) of causing doctors to be deprived of any opportunity to practice medicine on terms of their own choosing, nor (e) of causing doctors to be denied the use of hospital facilities in Oregon, nor (f) of causing hospitals to be denied the privilege of making their facilities available to doctors and members of the public, nor (g) of causing the market for the sale and distribution of medicines, drugs, medicine supplies and medical equipment to be restricted.

34. Defendant medical societies are voluntary associations. Membership or non-membership in any of defendant societies has no effect on the privilege to practice medicine in Oregon under state laws. Membership on a hospital staff in Oregon is granted or withheld by the governing body of the particular hospital and has not been granted or withheld from any doctor because of his connection with any prepaid medical care organization, whether such organization was sponsored by defendants or not.

No doctor has been deprived of any staff membership in any hospital in Oregon because of his connection with any prepaid medical care organization not sponsored by defendants.

■ 35. It is common knowledge, of which this Court takes judicial knowledge, that there are many insurance companies incorporated and having offices in states other than Oregon which sell insurance policies within Oregon providing for prepaid medical care plans in the form of indemnity insurance. No proof has been adduced as to the volume of such business, but such volume is large. Defendants approve all indemnity insurance plans, and have approved such plans through the period involved in this suit. No attempt has been made by the plaintiff to prove restraint upon such plans by defendants, and there is no evidence of any such restraint.

36. In the early days of the period made the subject of this suit, hospital associations engaged in many practices which interfered with the doctor-patient relationship in Oregon and which were not to the

best interests of the doctors' patients. These practices had the effect of increasing the profit of the associations. Because of these practices, the hospital associations alienated individual doctors. Some doctors who were practicing during such early period still hold animosity against such associations. But with the evolution of the hospital association business, and the gradual tendency to eliminate abuses, and the coming of new doctors on the scene, the past is gradually becoming forgotten.

37. The motive and intent of defendants has not been to restrain or monopolize, and monopoly has not in fact resulted and does not exist, nor does any unreasonable restraint exist in the business of prepaid medical care or the furnishing of medical care by reason of any act or conduct of defendants, or any of them.

38. If there was a conspiracy prior to 1941, as alleged by the Government, the Court finds that a large percentage of Oregon doctors entered the armed forces in the period 1941–1945, and that at that time the thread was broken and the conspiracy ended.

39. If there was a conspiracy, as alleged by plaintiff, prior to 1941, the Court finds that the thread was broken and the conspiracy ended when the organized doctors of Oregon reversed their position in 1941 in regard to offering a plan for prepaid medical care and engaged in contract practice through the medium of their own organization, defendant Oregon Physicians' Service; and if the defendants or any doctors of Oregon had previously been conspirators, they then became competitors, competing with the existing privately owned and operated prepaid medical care organizations.

40. Defendant Oregon Physicians' Service and also the doctor-owned county and regional prepaid medical care plans are business competitors with the privately-owned profit making organizations operating in the State of Oregon and, as competitors, the defendants and other doctors of Oregon have conducted their organizations fairly and well within the legal limitations of competitive business practice.

41. The practice of medicine as conducted within the State of Oregon by doctors of Oregon, including defendants, is not trade or commerce within the meaning of Section 1 of the Sherman Anti-Trust Law, 15 U.S.C.A. § 1, nor is it commerce within the meaning of the constitutional grant of power to Congress "To regulate Commerce * * * among the several States". Article 1, § 8, cl. 3.

42. The sale of medical services, by Doctor Sponsored Organizations, as conducted within the State of Oregon, is not trade or commerce within the meaning of Section 1 of the Sherman Anti-Trust Law, nor is it commerce within the meaning of the constitutional grant of power to Congress "To regulate Commerce * * * among the several States".

43. If there has been any restraint of trade by reason of any act or conduct of the defendants, or any of them, the Court finds that such restraint was and is not unreasonable.

44. Some or all of the defendants have participated in the preparation and promulgation of schedules of fees to govern charges to be made by doctors in the furnishing of medical and surgical care provided in connection with (1) the prepaid medical care plans of Oregon Physicians' Service and other doctor-sponsored prepaid medical care plans in the State of Oregon, and (2) activities of certain governmental agencies, at the request of such agencies. The schedules of fees used in connection with Oregon Physicians' Service and other doctor-sponsored prepaid medical care plans do not themselves necessarily set forth the actual fees to be collected by doctors, but instead determine the relative proportions of the net profits of such prepaid medical care plans, during any given period of time, to be received by doctors for specified medical services. Doctors participating in said plans agree to accept compensation for services based upon a percentage of the amount available for distribution to doctors after deduction of hospital charges and other expenses.

Except in connection with the rendering of services under said prepaid medical care

plans or governmental activities, there has been no attempt by any of the defendants to fix or designate fees or charges to be made by doctors in Oregon in the rendering of medical or surgical services.

The Court further finds that the fixing of fees is a necessary element and of the very essence of all prepaid medical care plans, whether doctor-owned or privately-owned, and that all prepaid medical care organizations in Oregon, including commercial organizations, fix or designate or determine fees for services under or pursuant to or in cooperation with said plans. In the case of doctor-sponsored prepaid medical care organizations, the purposes of these fee schedules are as above stated; and in the case of commercial organizations, the schedule of fees designates either (1) the amounts to be paid doctors for specified services, or (2) the maximum amounts of indemnity to be paid members of or subscribers to said organizations for fees paid or incurred by them for medical or surgical services.

45. Defendant Oregon Physicians' Service and the various county or regional doctor-owned or doctor-sponsored prepaid medical plans were not formed to eliminate or restrain organizations already in the field; nor were they formed to prevent or hinder or restrain other organizations from entering into the business of prepaid medical care; but on the contrary, they were formed to meet the social need which had arisen for group medical care, eliminating the element of private profit, over and above legitimate hospital and medical charges.

46. As used in this finding, the expression to "take tickets" means that a doctor rendering services to a member of a prepaid medical care plan sends his statement for services to the corporation or other organization owning or controlling said plan, and accepts checks from said organization. The Court finds that there is no present conspiracy, combination, agreement or concert of action among doctors not to "take tickets" of privately owned hospital associations; nor is there any conspiracy, combination, agreement or concert of action among doctors not to accept payment from privately owned hospital associations. The Court further finds that refusal by doctors to "take tickets" of or accept payment from privately owned associations is not boycott.

The Court further finds that the private hospital associations operating in Oregon have not insisted or requested that doctors "take tickets" and that the contracts of such associations do not obligate them to make payment to doctors who "take tickets". Both under such contracts and the practice of such hospital associations, if the patients receive from the doctors itemized statements of services rendered, the doctor has cooperated with the association. The Court further finds that there is no combination or conspiracy or concert of action of the defendants or the doctors of Oregon to refuse to render such itemized statements to patients who may be entitled to reimbursement from such private hospital associations.

47. If some or all the defendants at any time boycotted privately owned hospital associations, the Court finds that none of the defendants in recent times has boycotted privately owned hospital associations, and that none of the defendants, so far as the evidence or legitimate inferences show, has any intention to boycott privately-owned hospital associations in the future.

48. While the complaint alleged a restraint on hospitals by defendants, no substantial evidence was offered in support thereof, and the Court finds that none of the defendants in any manner restrained hospitals or hospital services or the opportunities of doctors or of patients to obtain hospital services.

49. At no time within recent years has membership in any medical society been denied to any doctor because of his connection with any private hospital association.

50. The number of physicians and surgeons in the State of Oregon licensed to practice medicine and surgery and also the number of members of Oregon State

Medical Society during each of the years from 1936 to 1948, both inclusive, were approximately as follows:

| Year | Number of Licensed Physicians & Surgeons | Number of Members of Oregon State Medical Society |
|------|------|------|
| 1936 | 1215 | 742 |
| 1937 | 1253 | 755 |
| 1938 | 1272 | 746 |
| 1939 | 1278 | 774 |
| 1940 | 1343 | 839 |
| 1941 | 1338 | 866 |
| 1942 | 1295 | 906 |
| 1943 | 1097 | 932 |
| 1944 | 1039 | 982 |
| 1945 | 1042 | 1000 |
| 1946 | 1428 | 1010 |
| 1947 | 1566 | 1142 |
| 1948 | 1660 | 1210 |

51. Columbia County Medical Society knew of no doctors or members of hospital staff not members of their society. Only one or two doctors in Clackamas County have not belonged to the Physicians Association of Clackamas County. All the doctors in Douglas County have been members of the Douglas County Medical Society. With the exception of a couple of doctors whose licenses were taken away, one doctor who resigned, and one doctor not residing in Jackson County, all doctors practicing in the county were members of Jackson County Medical Society. The only doctors practicing within Marion and Polk Counties who have not been members of the defendant society have been doctors employed by the Oregon State Hospital. In 1949 the Multnomah County Medical Society had at least 600 members.

Based upon the foregoing Findings of Fact, the Court enters the following

## Conclusions of Law

### I.

■ Medical societies have the right to take such steps as to them shall be deemed appropriate for the purpose of upholding the standards of the medical profession. The exercise of this right was the sole purpose and motive of defendant Multnomah County Medical Society in proceedings prior to 1941 for the expulsion of members; and has been the purpose and motive of other acts of defendants herein, as shown by the evidence.

### II.

■ Neither individual doctors nor medical societies are, in the absence of contract, under any obligation to assist or cooperate with commercial hospital associations or other organizations contracting for the furnishing of medical care.

### III.

■ Defendants are not guilty of any of the charges set forth in the complaint.

### IV.

In view of the Findings and Conclusions of the Court, it is unnecessary for the Court to pass upon the question whether interstate commerce is involved in the practice of medicine or in the sale of prepaid medical care or in any alleged acts or conduct of any defendants, as alleged in the complaint.

### V.

A final judgment should be entered in this action dismissing plaintiff's complaint and action with prejudice.

## Appendix A

### Complaint

The United States of America, plaintiff, by its attorneys, acting under the direction of the Attorney General of the United States, complains and alleges on information and belief as follows:

#### I. Jurisdiction and Venue

1. This complaint is filed and these proceedings are instituted under section 4 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", 26 Stat. 209, as amended, said Act being commonly known and hereinafter referred to as the Sherman Act, against the above-named defendants, in order to prevent and restrain further violations by them, as hereinafter alleged, of sections 1 and 2 of said Act, 15 U.S.C.A. §§ 1, 2.

2. The unlawful monopolizing, attempts to monopolize, combinations and conspiracies to monopolize, and contracts, combinations, and conspiracies in restraint of trade and commerce among the several states, hereinafter described, have been conceived, carried out, and performed, and are being carried out and performed in part within the District of Oregon.

## II. Defendants

3. Defendant, the Oregon State Medical Society is an unincorporated association, having its office and principal place of business in Portland, Oregon. It is affiliated with the American Medical Association.

4. Defendant, the Oregon Physicians' Service is a corporation incorporated under the laws of the State of Oregon and having its office and principal place of business in Portland, Oregon. The Oregon Physicians' Service furnishes prepaid medical, surgical, and hospital care on a prepaid contract basis. It is sponsored and approved by the Oregon State Medical Society and is controlled and operated by members of that society. It sponsors, approves, and cooperates with component county societies and organizations controlled by the latter which offer prepaid medical plans.

5. Defendant, Clackamas County Medical Society is an unincorporated Association, having its office and principal place of business in Oregon City, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

6. Defendant, Clatsop County Medical Society is an unincorporated association, having its office and principal place of business in Astoria, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

7. Defendant, Columbia County Medical Society is an unincorporated association, having its office and principal place of business in St. Helens, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

8. Defendant, Douglas County Medical Society is an unincorporated association, having its office and principal place of business in Roseburg, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

9. Defendant, The Jackson County Medical Society is an unincorporated association, having its office and principal place of business in Medford, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

10. Defendant, The Lane County Medical Society is an unincorporated association, having its office and principal place of business in Eugene, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

11. Defendant, The Marion-Polk Counties Medical Society is an unincorporated association having its office and principal place of business in Salem, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

12. Defendant, the Multnomah Medical Society is an unincorporated association having its office and principal place of business in Portland, Multnomah County, Oregon. It is affiliated with the Oregon State Medical Society and the American Medical Association.

13. Defendant, W. W. Baum is a doctor at Salem, Oregon. He is a member of the Oregon State Medical Society.

14. Defendant, John Besson is a doctor of Portland, Oregon. He is a member of the Oregon State Medical Society.

15. Defendant, J. P. Brennan is a doctor at Pendleton, Oregon. He has been an officer or director of one or more of defendant corporations or associations during all or part of the conspiracies hereinafter described.

16. Defendant, John H. Fitzgibbon is a doctor at Portland, Oregon. He has been an officer or director of one or more of the defendant corporations or associations during all or part of the conspiracy hereinafter described.

17. Defendant Charles E. Hunt is a doctor at Eugene, Oregon. He has been an officer or director of one or more of the defendant corporations or associations

during all or part of the conspiracy hereinafter described.

18. Defendant Gordon B. Leitch is a doctor at Portland, Oregon. He has been an officer or director of one or more of the defendant corporations or associations during all or part of the conspiracy hereinafter described.

19. Defendant K. H. Martzloff is a doctor at Portland, Oregon. He has been an officer or director of one or more of the defendant corporations or associations during all or part of the conspiracy.

20. Defendant E. H. McLean is a doctor at Oregon City, Oregon. He has been an officer or director of one or more of the defendant corporations or associations during all or part of the conspiracy.

### III. Definitions

21. Medical care as used herein includes medical, surgical, and dental treatment, hospital care, and allied services, including the furnishing of medicine and medical supplies.

22. Prepaid medical care plans are plans under which medical care is procured or paid for by organizations engaged in the business of issuing policies or contracts covering the cost of medical care to individuals or groups of individuals.

### IV. Nature of Trade and Commerce

23. Various organizations are engaged in the business of supplying medical care to individuals, groups of individuals, and business concerns on a contract basis. Some of said organizations have their main offices in Oregon and carry on a substantial part of their business within that state.

24. Organizations with offices outside of Oregon offer to make and do make contracts with residents of Oregon for prepaid medical, surgical, and hospital care and allied services. In the absence of the restraints hereinafter described, the State of Oregon would constitute a substantial market for the prepaid medical care business of such organizations.

25. Organizations having their main offices in Oregon sell prepaid medical care policies in the states of Oregon, Washing-
ton and California. Organizations doing prepaid medical insurance business in the State of Oregon use interstate transportation and transmission facilities to transmit across state lines policies, reports, instructions, and correspondence, and there is a regular flow of reports, communications, and commerce between said Oregon organizations and agents, doctors, and customers located in states other than Oregon. Medical care policies and payments thereon by policy holders regularly flow in interstate commerce between the State of Oregon and other states. Prepaid medical policies issued by Oregon organizations cover medical care required by Oregon residents while in other states. It is a part of the regular course of business of said Oregon organizations to arrange to pay for said medical care rendered by doctors, hospitals, and others in other states, or to provide policy holders in other states with transportation to Oregon for medical care. All of these transactions necessitate a regular course of business dealings between said Oregon organizations and individuals and organizations in other states. Business dealings across state lines are had between medically insured residents of Oregon and hospitals, doctors, and other persons located in states other than Oregon.

26. Organizations engaged in the sale and furnishing of prepaid medical care in Oregon are regularly engaged, as a part of said business, in the purchase and procurement of medicines, drugs, medical supplies, and instruments shipped from other States into the State of Oregon, and into other States; and said organizations cause the shipment from States other than Oregon of medicines, drugs, medical supplies, and instruments to doctors and purchasers other than said organizations in the State of Oregon, and other states.

27. Many industrial concerns located in Oregon are parties to, or but for the restraints hereinafter set forth would be parties to, contracts with organizations under which their employees secure prepaid medical care. Industrial concerns located in other states carry prepaid medical insurance for their employees with prepaid medical care organizations having their main-

offices in Oregon, and use Oregon medical care facilities for treatment of their employees. A substantial number of their employees reside in states other than Oregon.

28. Doctors practicing in Oregon treat patients who have come from other states to secure medical care in Oregon pursuant to prepaid medical care policies held by such patients. The facilities of hospitals located in Oregon are used by residents of other states who have come to Oregon for the purpose of using said facilities pursuant to the terms of their prepaid medical care policies. Similarly, doctors in other states treat patients coming from the State of Oregon, and hospitals in other states are used by residents of Oregon, pursuant to the terms of the prepaid medical care policies of those patients.

29. Medicines, drugs, medical supplies, and equipment continuously come into and go out of the State of Oregon as the result of medical care by Oregon doctors and hospitals under prepaid medical care plans. Medicines, drugs, medical supplies, and equipment are shipped into states other than Oregon by virtue of medical care provided by doctors and hospitals in Oregon under prepaid medical care plans.

30. Prepaid medical care organizations providing prepaid medical care in the State of Oregon cannot carry on their business without cooperation or participation of doctors and hospitals in Oregon. Unless doctors and hospitals in Oregon provide medical treatment to members of prepaid medical care programs and accept payment therefor from prepaid medical care organizations, performance of contracts for prepaid medical care is made impossible.

### V. Offenses Charged

31. Beginning on or about January 1, 1936, and continuing thereafter up to and including the date of filing this complaint, the defendants have attempted to, and have been engaged in a combination and conspiracy to, restrain and monopolize interstate trade and commerce in the business of selling and furnishing prepaid medical care in the state of Oregon and in other states, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2. Defendants threaten to continue such offenses and will continue them unless the relief hereinafter prayed for in this complaint is granted.

32. The conspiracy has consisted of a continuing agreement and concert of action among the defendants, the substantial terms of which have been that defendants agree:

(a) To monopolize and attempt to monopolize prepaid medical care business in the State of Oregon and between the State of Oregon and other states.

(b) To limit the scope of medical care to be provided by prepaid medical care plans in the State of Oregon.

(c) To prevent, hinder, and obstruct prepaid medical care organizations other than those sponsored by defendants from continuing to engage in or from engaging in the business of selling and furnishing prepaid medical care in Oregon and in other states.

(d) To restrain residents of Oregon and other states from entering into or continuing under prepaid medical care plans not sponsored or supported by the defendants.

(e) To prevent doctors from cooperating in prepaid medical care plans not sponsored or approved by defendants.

(f) To restrict the use of hospital facilities by doctors cooperating in prepaid medical care plans other than those sponsored or approved by defendants.

(g) To prevent Oregon hospitals from allowing their facilities to be used by doctors and patients associated with prepaid medical care plans other than those sponsored or approved by defendants.

33. The combination and conspiracy hereinabove described and the intended restraints which have resulted therefrom have been effectuated in the following manner and by the following means:

(a) Defendants have hindered and obstructed prepaid medical care organizations in their attempts to procure and retain qualified doctors to cooperate with them.

(b) Defendants have expelled, threatened, and incited the expulsion from medical societies of doctors cooperating in pre-

paid medical care plans other than those sponsored or approved by the defendants.

(c) Defendants have formed and promoted their own prepaid medical care plans with the intent to drive out, hinder, and obstruct other commercial medical care plans operating in the state of Oregon.

(d) Defendants have interfered with commercial prepaid medical care organizations other than those sponsored or approved by them in obtaining hospital facilities for their members.

(e) Defendants have refused to treat patients and have caused others to refuse to treat patients who are members of a prepaid medical care plan not endorsed by defendants unless the patient pays cash.

(f) Defendants have refused and encouraged other doctors to refuse to give patients who are members of a prepaid medical care plan not endorsed by defendants itemized statements that will enable the patient to be reimbursed under the plan to which he has subscribed.

(g) Defendants have refused to consult or assist and have encouraged others not to consult or assist doctors who treat members of a prepaid medical care plan not endorsed by them.

(h) Defendants have spread false propaganda among doctors, hospitals, and the general public for the purpose of discrediting any prepaid medical care plans not endorsed by them.

(i) Defendants have agreed among themselves and with others not to compete with each other for prepaid medical care business or with other similar organizations approved by or affiliated with them.

(j) Defendants have succeeded in making hospital facilities in Oregon available only to members of defendant Oregon Medical Society and its component county medical societies, and have restricted and excluded other qualified doctors cooperating in prepaid medical plans other than those sponsored or approved by defendants from access to such facilities.

34. Each of the individual defendants has been active individually and as an officer or member of defendant associations or corporations in the violations herein alleged.

## VI. Effects of Violations

35. The following effects, among others, have resulted from the violations aforesaid:

(a) Prepaid medical care organizations other than those sponsored by the defendants have been prevented and hindered in entering into or expanding their business in Oregon. The business of such organizations outside the State of Oregon has been impeded and their ability to do business outside Oregon has been impaired.

(b) The public in and out of Oregon has been deprived of a fair and free opportunity to acquire prepaid medical care insurance from organizations competing with one another in a free market.

(c) Members of the public in and out of Oregon have been deprived of medical care, which, save for the restraints herein described, would have been afforded them.

(d) Business concerns in and out of Oregon have been deprived of the opportunity to obtain prepaid medical insurance for their employees in an unrestrained market, and their business within and outside the State of Oregon has been adversely affected thereby.

(e) Doctors have been deprived of an opportunity to practice medicine in Oregon on terms of their own choosing, pursuant to the laws of Oregon.

(f) Doctors in Oregon and outside of Oregon have been denied the use of hospital facilities in Oregon.

(g) Hospitals in Oregon have been denied the privilege of making their facilities available to doctors and members of the public.

(h) The market for the sale and distribution of medicines, drugs, medical supplies, and medical equipment has been unduly restricted.

## VII. Prayer

Wherefore plaintiff prays:

(1) That pursuant to Section 12 of the Clayton Act, 15 U.S.C.A. § 22, an order be made and entered requiring such of the de-

fendants as are not residing within this district to be brought before this Court in this proceeding as parties defendant, and directing the Marshals of the District in which they severally are inhabitants, or may be found, to serve summons upon them;

(2) That the combinations and conspiracies in restraint of interstate trade and commerce, together with the attempts to monopolize, conspiracy to monopolize, and monopolization of the same, hereinbefore described, be declared to be illegal and violative of the Sherman Acts;

(3) That defendants be perpetually enjoined from further engaging in or carrying out said restraints and conspiracy, from doing any act in furtherance thereof, and from engaging in any similar conspiracy or course of conduct;

(4) That defendant medical societies be perpetually enjoined from refusing to take into their membership, and from expelling or threatening to expel from their membership, any doctor because of his cooperation in medical care plans other than those sponsored or approved by the defendants;

(5) That defendant medical societies, upon application or request therefor by any such doctor, shall reinstate as a member in good standing any doctor who has been expelled from membership because of his cooperation in a medical care plan other than those sponsored or approved by the defendants;

(6) That defendants be perpetually enjoined from persuading or inducing or attempting to persuade or induce hospitals to discriminate in the use of their facilities against doctors or patients cooperating or associated with medical care plans other than those sponsored or approved by defendants;

(7) That defendants be perpetually enjoined from persuading or inducing, or attempting to persuade or induce doctors not to cooperate in medical care plans other than those sponsored by the defendants;

(8) That the defendants be perpetually enjoined from suggesting, advocating, or agreeing that doctors should refuse to treat patients who are associated with medical care plans other than those sponsored or approved by the defendants; or to discriminate against said patients with respect to fees charged for medical services; or discriminate against said patients by requiring them to pay cash for medical services; or refuse to supply itemized statements to said patients showing the medical services rendered and the fees charged therefor;

(9) That defendants be perpetually enjoined from the publication or dissemination of false or disparaging publicity concerning medical care plans other than those sponsored or approved by the defendants;

(10) That defendants be perpetually enjoined from advocating, inducing, or agreeing that doctors who are members of defendant medical societies should refuse to consult in the diagnosis, care, or treatment of patients of doctors cooperating in medical care plans other than those sponsored or approved by the defendants; or of doctors who are not members of defendant medical societies;

(11) That defendant medical associations be perpetually enjoined from refusing to give approval to any medical care plan on the ground that said plan is controlled or sponsored by a commercial organization; or that said plan provides for medical care of patients having incomes above any given amount; or that said plan would compete with one or more other medical care plans approved or sponsored by the defendants;

(12) That defendant medical societies be required to advise in writing all of their component county medical societies, and to publish a statement in Northwest Medicine, that it no longer be the policy of said medical societies to do those things which, as hereinbefore alleged, they have combined and conspired to do, specifically including those things which defendants are enjoined from doing;

(13) That the plaintiff have such other and further relief as the court may deem just and proper;

(14) That the plaintiff recover its costs.