[Civ. No. 22953. Second Dist., Div. Two. May 23, 1958.]

SYLVAN OSCAR TATKIN, Petitioner, v. SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; LOS ANGELES COUNTY MEDICAL ASSOCIATION et al., Real Parties in Interest.

746

Wyman & Finell and Marvin Finell for Petitioner.

Harold W. Kennedy, County Counsel, and William E. Lamoreaux, Assistant County Counsel, for Respondent.

Frederick O. Field, Gibson, Dunn & Crutcher, Leslie G. Turner, John J. Hanson, O'Melveny & Myers, Warren M. Christopher, Norbert A. Schlei, Overton, Lyman & Prince and Carl J. Schuck for Real Parties in Interest.

KINCAID, J. pro tem.*—Petitioner, plaintiff in an action pending in the Superior Court of Los Angeles County, seeks a writ of mandate directing the respondent court to set aside an order sustaining defendants' refusal to answer certain questions in a pretrial deposition and to enter an order compelling defendants to answer these questions.

Demurrers having been overruled, a third amended complaint was filed and the defendants, American Medical Association, Los Angeles County Medical Association, and certain named individuals, have filed their answers thereto.

---

*Assigned by Chairman of Judicial Council.

The third amended complaint of plaintiff contains three causes of action and alleges generally that since August 1, 1953, plaintiff has been and is a duly licensed doctor of medicine authorized to practice medicine in the State of California; that on September 21, 1954, plaintiff was notified that his application for membership in the defendant Los Angeles Medical Association had been refused; that since then he has suffered damages as a result of the acts and conduct of defendants. The plaintiff has affirmatively alleged that the defendants have conspired and combined to dominate and control the practice of medicine in Los Angeles County in such a manner as to prevent competition between licensed doctors in the area and members of the defendant Los Angeles County Medical Association particularly when the licensed doctor has come from out of state; that pursuant to this conspiracy and combination, the defendant Los Angeles Medical Association has established a minimum scale of fees to be charged for services rendered by its members to the public; that pursuant to the said conspiracy and combination, the defendants have not left open membership in the defendant Los Angeles Medical Association to doctors of medicine of even the highest professional and ethical qualifications; that defendants have established disciplinary sanctions against members of the defendant Los Angeles County Medical Association who consult with or cooperate with doctors of medicine who are not members of the defendant association; and that pursuant to the said conspiracy and combination, a grading system of hospitals has been set up, the result of which is that only members of the defendant Los Angeles County Medical Association are eligible for membership on the staffs of over 90 per cent of the hospitals in the Los Angeles County area.

Plaintiff further alleges that his professional and ethical qualifications are of the highest calibre; that he was, prior to August 1, 1953, when he came to Los Angeles County, a member of the Yakima County Medical Association, Yakima, Washington; that while practicing in Los Angeles County, he has at all times charged fees for treatment lower than those prescribed as minimum by the defendant Los Angeles Medical Association; that he made his services available to the public at a greater number of hours per day and days per week than the members of the defendant association practicing in his community; that he applied for, and was denied, membership in the defendant Los Angeles Medical

Association without any reasons having been given for his rejection; that thereafter he was expelled from the staff of the Behrens Memorial Hospital even though his services had been completely satisfactory; that when he attempted to construct a hospital of his own in the community in which he practiced the members of the defendant Los Angeles County Medical Association refused to cooperate with him in any way, and actively took steps to make the construction impossible by opposing the granting of a zoning variance by the city commission.

Plaintiff caused a subpoena duces tecum to be issued to defendant William F. Quinn, secretary-treasurer of defendant Los Angeles County Medical Association, requiring him to appear for deposition and to produce the following: All letters written by any member of the Los Angeles County Medical Association or Yakima County Medical Association or by any officer of either association regarding Dr. Sylvan O. Tatkin; all investigation report or reports by investigator or investigators regarding the professional, personal, ethical or moral background of Dr. Sylvan O. Tatkin; all documents presented to the council of the Los Angeles County Medical Association at any meeting pertaining to any application of Dr. Sylvan O. Tatkin for membership or used by the council or any member thereof in connection with the determination of Dr. Sylvan O. Tatkin's qualification for membership in the Los Angeles County Medical Association; all other books, records, papers, documents and files of every type or nature whatsoever obtained by the Los Angeles County Medical Association in connection with its deliberations on Dr. Sylvan O. Tatkin's application for membership in the Los Angeles County Medical Association.

Quinn, on advice of counsel, refused to answer any and all questions put to him concerning the criteria, rules, regulations or policies of the defendant Los Angeles County Medical Association in passing on membership applications and all questions put to him concerning the consideration of plaintiff's application for membership. He also refused to produce any of the documents subpoenaed, as the documents dealt with the same subject matter as the questions, and both the documents and the questions were objected to on the ground of irrelevancy and immateriality.

The defendant's refusal to answer was thereupon duly certified to respondent court resulting in an order to answer

questions numbered one and two but sustaining objections to the remaining 21 questions.

Since an appeal from the final judgment would not afford plaintiff an adequate remedy for correcting the order of respondent court sustaining said defendant's refusal to answer the questions on deposition, mandamus is the proper remedy. (*I.E.S. Corporation* v. *Superior Court,* 44 Cal.2d 559, 564 [283 P.2d 700] ; *McClatchy Newspapers* v. *Superior Court,* 26 Cal.2d 386, 392 [159 P.2d 944].)

As was said in the McClatchy case (pp. 393, 394, 395) : "Ordinarily the trial court has no discretion to refuse to exercise its powers so far as necessary to secure to a litigant the right to a deposition in the cases defined by the code. (Citations.) The language of section 2021 of the Code of Civil Procedure providing that 'The testimony of a witness . . . may be taken by deposition' confers upon litigants the *right* to take depositions. (Citation.) . . . By refusing to compel a witness to answer proper questions, a trial court may effectively deny a litigant the right to take a deposition, since a right without means of enforcement, if such can exist, is of little practical value. Consequently, trial courts have been directed by writ of mandate to compel witnesses to answer questions on the taking of their depositions on the theory that it is their judicial duty to secure to a party the means of obtaining in advance of the trial information concerning the issues and the means of producing at the trial the evidence necessary to sustain his action or defense. (Citations.) . . .

"The respondent court declined to compel plaintiff to answer the questions upon the ground that they were directed to defenses which had been eliminated by the ruling on demurrer, and that therefore the answers would be incompetent and immaterial as not within the issues. While the order on demurrer ruled out certain issues for the time being, the status of the pleadings as so limited is not the exclusive measure of the scope of inquiry on deposition. Different principles govern the determination of the materiality of evidence sought to be obtained by means of depositions and the admissibility of evidence offered upon the trial. The relevancy of evidence on the taking of a deposition is to be determined by the subject matter of the action and by the potential as well as actual issues in the case. (Citations.) . . . The fact that the ruling on demurrer eliminated the issues embraced by the deposition does not prevent such

issues from being classed as potential. The sustaining of a demurrer relates only to the issues raised by the pleadings as they exist at the time of the ruling on the demurrer. A trial court may nevertheless properly permit an amendment to the pleadings during the course of trial; it may reconsider its ruling during trial; or the ruling may be reversed upon appeal.''

█ And as said in *I.E.S. Corporation* v. *Superior Court, supra,* 44 Cal.2d 559, at pages 562, 563: ''In the interest of full disclosure, the witness in a deposition taken pursuant to section 2021, subdivision 1, of the Code of Civil Procedure must answer all questions seeking nonprivileged information that is material to the subject matter of the pending action (citations), and he cannot block the interrogation by contending that it is a 'fishing expedition' or by urging the secrecy of his methods of doing business. █ At the same time, the taking of a deposition must not be abused (citation), and the witness need not answer questions that serve no proper purpose or are irrelevant. (Citations.) . . .

''Similarly, plaintiff was entitled to learn the sources of the goods to determine whether they were sold to defendant in the condition and at the prices represented and whether the sellers had conspired with defendant to defraud plaintiff.''

█ The trend of judicial decisions is to relax the rules which relate to the taking of evidence by ancillary proceedings. (*Dowell* v. *Superior Court,* 47 Cal.2d 483, 486 [304 P.2d 1009]; *Union Trust Co.* v. *Superior Court,* 11 Cal.2d 449, 462 [81 P.2d 150, 118 A.L.R. 259].)

In further indication of this trend, section 2021 of the Code of Civil Procedure has now been replaced by section 2016 which provides for the taking of the deposition of any person for the purpose of discovery, or for use as evidence in the action or for both purposes. Subsection (b) of section 2016 provides: ''[*Scope of examination.*] Unless otherwise ordered by the court as provided by subdivision (b) or (d) of Section 2019 of this code, the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the examining party, or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of relevant facts. It is not ground for objection that the testimony

will be inadmissible at the trial if the testimony sought appears reasonably *calculated* to lead to the discovery of admissible evidence. All matters which are privileged against disclosure upon the trial under the law of this State are privileged against disclosure through any discovery procedure. This article shall not be construed to change the law of this State with respect to the existence of any privilege, whether provided for by statute or judicial decision, nor shall it be construed to incorporate by reference any judicial decisions on privilege of any other jurisdiction.''

In the light of these rules relating to discovery it is evident that unless the matters sought to be elicited by the refused questions are privileged against disclosure under the law of this state upon the trial of the action by plaintiff against defendants, the real parties in interest herein, or are clearly irrelevant as determined by the subject matter of such action and by the potential as well as actual issues in the case, the questions should be answered.

Plaintiff's complaint is based on the theory that plaintiff, a qualified doctor, has been denied the use of hospital facilities and association with other doctors by reason of the individual defendants' conspiracy to illegally limit these associations and the use of these facilities to members of the defendant Los Angeles County Medical Association. The gist of the action is that the effect of the domination of the practice of medicine in Los Angeles County by the defendant Los Angeles County Medical Association has been to remove a qualified practitioner from competition with those in the select body, and that defendants have in this manner engaged in a course of conduct constituting an illegal conspiracy in restraint of trade. In addition, plaintiff alleges a cause of action on the theory of an unjustifiable, concerted refusal to deal, and on the theory of an unjustifiable interference with contractual and advantageous relationships. Plaintiff is seeking damages for injuries caused to him by the tortious conduct of defendants. He is not seeking either directly or indirectly to compel the defendant association to admit him to membership.

In considering what would be relevant to this issue, it is plaintiff's theory that the alleged practices of the defendant association, particularly those respecting the use of hospitals and the cooperation and consultation of member doctors of medicine with nonmember doctors of medicine, have been calculated to make it impossible for a nonmember to compete

with a member of the association in the practice of medicine. It is plaintiff's position that membership was denied to him in order to prevent him from competing successfully with members of the defendant association by charging lower rates for treatment, and working longer hours than other doctors in his community.

The basic issue presented by the pleadings in the instant case is the existence or nonexistence of a combination by the named defendants to restrain competition by the plaintiff.

The statutory privileges set forth in section 1881, Code of Civil Procedure, provide against the examining of a witness as to confidential communications between husband and wife, attorney and client, confessor and confessant, physician and patient, public officers and certain newspaper personnel. As said in *Samish* v. *Superior Court*, 28 Cal.App.2d 685, 695 [83 P.2d 305] : ''Since the protection against privileged communications often leads to a suppression of the truth and to a defeat of justice, the tendency of the courts is toward a strict construction of such statutes. (*Dwelly* v. *McReynolds*, 6 Cal.2d 128, 131 [56 P.2d 1232] ; 27 Cal.Jur. 44, § 30.) Unless the statute expressly extends the privilege to specific persons or classes, the law will not justify such individuals in refusing to disclose facts contained in documents which would otherwise be competent evidence in a particular proceeding. In the Dwelly case, *supra,* the court said :

'' ' ''The burden is upon the party seeking to suppress the evidence to show that it is within the terms of the statute.'' (Citations.) The statements to be privileged and hence inadmissible *must come within the express terms of the section.* (Citations.) ' ''

Measuring the matters here in question no privilege against disclosure is extended defendants by the provisions of section 1881, Code of Civil Procedure.

Defendants argue that public policy demands that documents, communications and information of the nature and type sought herein should be treated as confidential and not available for disclosure and inspection as desired by the petitioner. They cite *Runyon* v. *Board of Prison Terms and Paroles,* 26 Cal.App.2d 183 [79 P.2d 101], in support of their contention. This case involved letters and other communications sent voluntarily by various individuals to a public agency, the State Board of Prison Terms and Paroles, in connection with the hearing and determination of applications for parole of prisoners. The facts of the Runyon case are not

analogous to a situation as here involved where communications are sent to a private voluntary association relating to the applications for membership therein and the action taken thereon.

In the case of *I. E. S. Corporation* v. *Superior Court, supra,* 44 Cal.2d 559, the complaint alleged that plaintiff entered into a series of contracts and options for the purchase of machinery from defendant. The complaint also alleged that defendant had conspired with various sellers of war surplus engines, and plaintiff's former president to induce plaintiff to purchase nonexistent, inferior and highly overpriced machinery, and that defendant had made an extensive buying trip in which he carried on activities in furtherance of the conspiracy. In giving his deposition, defendant refused to reveal from whom, in what manner, and at what prices he had acquired the engines, or any questions dealing with the identity of his sources and the nature of his transactions with them. All refusals were on the ground that the questions were immaterial and irrelevant. In ordering the defendant to answer, the court stated (p. 563): ". . . [P]laintiff was entitled to learn the sources of the goods to determine whether they were sold to defendant in the condition and at the prices represented and *whether the sellers had conspired with defendant to defraud plaintiff*." (Emphasis added.) Implicit in the statement of the court is the proposition that the defendant was required to reveal his course of dealing with the other conspirators *as that course of dealing related to the plaintiff* because that was the only way in which the plaintiff could show that a conspiracy did or did not exist. In the instant case, the course of dealing between the alleged coconspirators respecting the plaintiff had the same relevancy and materiality as in the I.E.S. case in that it goes to the existence, nature and scope of the alleged conspiracy.

Defendants assert that the denial by the respondent court of the right of plaintiff to inquire, by means of depositions and subpoenas duces tecum, into the activities of the Los Angeles County Medical Association, its admissions committee and its council, was a responsible control of such right. More especially they contend that since the courts will not interfere in the internal affairs of a voluntary association respecting applications for membership nor compel membership therein, questions or documents dealing with the reasons for petitioner's denial of membership therein and related rules in general become immaterial and irrelevant. They cite cases

to the effect that a voluntary association has the power to enact laws governing the admission of members and to prescribe the necessary qualifications for membership. Membership therein is a privilege which the society may accord or withhold at its pleasure, with which the courts will not interfere, even though the arbitrary rejection of the candidate may prejudice his material interest: *Harris* v. *Thomas* (Tex. Civ.App.), 217 S.W. 1068, 1076-1077; *Medical Soc. of Mobile County* v. *Walker*, 245 Ala. 135 [16 So.2d 321]; *Chapman* v. *American Legion*, 244 Ala. 553 [14 So.2d 225, 228]; *Gold Knob Outdoor Adv. Co.* v. *Outdoor Adv. Ass'n* (Tex.Civ. App.), 225 S.W.2d 645, 646-647; and *Mayer* v. *Journeymen Stone-Cutters Ass'n*, 47 N.J.Eq. 519 [20 A. 492, 494].

*Harris* v. *Thomas, supra,* a Texas case, was an action to restrain the defendant doctors from interfering with plaintiff's practice in the defendant hospital and, in the alternative, for damages. Plaintiff, an osteopath, was practicing in the defendant hospital when the medical association recommended the staff system to the defendant hospital. The defendant hospital followed the recommendations of the local medical association as to what doctors should be on the staff. The recommendations included only those doctors who were members of the medical association and omitted plaintiff. Plaintiff by virtue of not being a member of the medical association, was thereafter denied the right to practice in defendant hospital. Plaintiff filed suit and obtained a temporary injunction. The trial court thereafter ordered the temporary injunction dissolved and plaintiff appealed. In affirming the order of the trial court, the appellate court said (p. 1076, 1077): ". . . It seems to be appellant's contention that his exclusion from the organization and appellees' refusal to affiliate with him and holding that his license or diploma as an osteopath did not entitle him to fellowship with them influenced others against him and deprived him of the fruits of his preparation as a practitioner. *If appellees were acting to further their legitimate purpose or to advance the practice of their profession, this, we think, would be justified,* even if it had the result claimed by appellant. *Unless the organization was itself illegal or the methods used by it were wrongful,* appellant has no just complaint. . . . It is provided by such association that an applicant for membership must be of good moral character and licensed to practice under the laws of the state of Texas; that he must not support or profess an exclusive

system of medicine or advertise as such. The appellant was admittedly an osteopath, and his license to practice was obtained upon a diploma from a school of that system. His advertisement and card so gave his school of practice.

"Courts sometimes interfere where members have been wrongfully excluded or expelled, but as a rule they do not interfere with the right of an association to make laws or rules *unless they are against good morals or violate the laws of the state.* . . . If it deemed appellant an osteopath, and that as such he was supporting an exclusive system, the association and its members were within their rights, under its rules, in rejecting him as a member. They also had the right to refuse to assist him in operations. They could, if they deemed it to the interest of medicine or surgery, or the welfare of humanity, agree among themselves not to assist appellant in surgery *if they did so in good faith and with no intent to injure appellant.* . . . *If without malice or evil intent* the appellees did interfere with the privilege of appellant, *if they did so to serve some legitimate right or interest of their own,* they could do such acts themselves or cause others to do them *so long as no definite legal right of appellant is violated.*" (Emphasis added.)

*Medical Soc. of Mobile County* v. *Walker, supra,* 16 So.2d 321, an Alabama case, was an action to restrain the medical society from admitting applicants for membership until the requirements of the society's by-laws were complied with. In reviewing the rights of applicants to membership in a medical society, the court said (p. 324): ". . . Societies of the sort here considered have the right to make their own rules upon the subject of admission or exclusion of members, and these rules may be considered as articles of agreement, to which all who are members become parties. . . . They may make their own constitution and by-laws; and so long as they remain unchanged, each member is alike bound and shielded by them. . . . *Of course such constitution and by-laws, to be obligatory, must not contravene public law, nor any principle of public policy.* . . ." (Emphasis added.)

In *Chapman* v. *American Legion, supra,* 14 So.2d 225, an Alabama case, plaintiffs petitioned for a writ of mandamus to require the American Legion, Alabama Department, to issue a charter for the establishment of a local post. The court examined the Acts of Congress incorporating the Legion and the pertinent provisions of the Legion's constitution and by-laws and found them to establish minimum requisites for

membership but that eligibility alone did not require a person's acceptance. The court (p. 228) quoted from 7 Corpus Juris Secundum, Associations, page 56, section 23, "In other words, membership is a privilege which the society may accord or withhold at its pleasure, and a court of equity will not interfere to compel the admission of a person not regularly elected, even though the arbitrary rejection of the candidate may prejudice his material interests, *where no rights of property or of person are affected,* and no rights of citizenship are infringed on. . . ." (Emphasis added.)

A review of the foregoing cases cited by defendants discloses that they do not go to the extent of holding that the courts will never under any circumstances inquire into the reasons for denial of membership in a voluntary association. On the contrary they demonstrate that inquiry will not be precluded where tortious or illegal purpose and conduct are involved. They fail to support the contention that inquiry into the reasons for denial of membership will be precluded where, as here, it is charged that membership was denied for the purpose of restraining trade and competition, as a part of a conspiracy to restrain trade and competition, an unjustified concerted refusal to deal and an unjustified interference with contractual and advantageous relationships.

 Plaintiff asserts and the defendants, the real parties in interest, deny that a physician, injured by an unreasonable restraint of the practice of medicine, has a cause of action for restraint of trade under both common law principles and the Cartwright Act. (Bus. & Prof. Code, §§ 16700-16758.) While this question, so far as our research discloses, has never been directly decided by the courts of this state, certain cases from other jurisdictions construing the federal antitrust laws and analogous state statutes may be considered.

There are six relevant federal court opinions decided under the Sherman Act which have been concerned with the issue of whether certain activities in the medical field constitute "trade." Three of these six opinions arose in the course of a single case in which the American Medical Association and others were indicted for an alleged conspiracy to restrain trade in the District of Columbia in violation of the Sherman Act. In the first of these opinions, *United States v. American Medical Ass'n,* 72 App.D.C. 12 [110 F.2d 703], cert. den. (1940) 310 U.S. 644 [60 S.Ct. 1096, 84 L.Ed. 1411], the Court of Appeals for the District of Columbia reversed a trial court judgment sustaining a demurrer to the indictment. The in-

dictment charged that the defendant medical societies combined and conspired to impose restraint on physicians affiliated with a group health association engaged in the business of arranging for provision of medical care and hospitalization to members on a risk-sharing prepayment basis, by threat of or actual expulsion from the societies, by denying them essential professional contacts with other physicians, and by using coercive power to deprive them of hospital facilities for their patients, all constituting unreasonable "restraint of trade" within the provisions of the Sherman Anti-Trust Act. A demurrer to the indictment had been sustained, the trial court holding that the practice of medicine is not a trade within the meaning of section 3 of the Sherman Act. In reversing this ruling the court said (p. 707) : "The trial court was of opinion that the practice of medicine and the business of Group Health and the hospitals do not constitute 'trade' within the intent of the statute. The question is new, at least to the extent that there is no case in which, in the circumstances existing here, it has been decided, but a careful consideration of the language of the Act, its legislative background and the various statements of the Supreme Court concerning the source from which the congressional purpose may be gathered, leads us to conclude the trial court was in error.

"The phrase 'restraint of trade' had its genesis in the common law, and its legal import and significance is declared again and again in the decisions of English courts, both before and after the date of our independence, as well as in American decisions in many of the States. The Supreme Court has said that Congress passed the Sherman Act with this common law background in mind."

At page 710 the court quotes with approval from *Styles* v. *Lyon*, 87 Conn. 23 [86 A. 564, 566], as follows:

" 'The defendant insists there is a distinction between a business and a profession; that, while the period of restriction as to a business may be unlimited, the rule should not apply to a profession, since it is a purely personal relation whose benefits cease upon death or the cessation from practice. We do not think the distinction tenable. A profession partakes on its financial side of a commercial business, and its good will is often a valuable asset.' "

The court then said: "The indubitable effect of all these cases, English and American, is to enlarge the common acceptation of the word 'trade' when embraced in the phrase 'restraint of trade' to cover all occupations in which men

are engaged for a livelihood. We think it makes no difference that, after the practice of medicine had been recognized as embraced in the doctrine of 'restraint of trade', *Davis v. Mason, supra* [5 T.R. 118, 101 Eng.Rep. 69], a number of judges preferred to speak in broader terms of 'public policy' and the like, without using the word 'trade'. The foundation of the rule in restraint of trade cases is the rule of public policy, and always was from *Mitchel v. Reynolds,* [1711] 1 P.Wms. 181, 24 Eng.Rep. 347, on down, without distinction based on type of occupation involved.

"Perhaps the most illuminating of the English cases is *Pratt v. British Medical Association,* [1919] 1 K.B. 244. The case was a tort action to recover damages for molesting plaintiff doctors in the pursuit of their calling. The facts there and here are strikingly similar. The plaintiffs had joined the staff of an organization known as Coventry Provident Dispensary, which had fallen under the ban of the medical society because the members of the latter were opposed to what was called contract practice. The doctors who joined the staff of the organization were expelled from the society for violation of its rules of ethics and other members of the society were forbidden to consult with them on pain of expulsion. A 'black list' was published in the British Medical Journal, and the court found that the effect was to boycott the plaintiffs in their practice, greatly to their injury, and likewise that the purpose of the boycott was to increase the area of practice and the financial returns of the members of the society. On this subject the court said (p. 272) : 'If the Coventry Dispensary had been destroyed as a lay organization, then the local doctors would obviously have taken such steps as would have increased their area of private practice, and their emoluments would have gained a corresponding expansion. This was the fundamental object of the defendants. The non-participation in such aim by the plaintiffs was the head and front of their offending.'

"And considering the validity of the action of the defendants and their right by means of their own rules or canons to impose a restraint upon non-conforming physicians, the court said (p. 274) : 'The public interest must be regarded conjointly with the interest of individuals when restraint of trade is in question. . . . Upon considering the rules in question I have arrived at the conclusion that they are in restraint of trade, and are void on the ground of public policy. They gravely, and in my view unnecessarily, inter-

fere with the freedom of medical men in the pursuit of their calling, and they are, I think, injurious to the interests of the community at large. It may well be that the opinion I have just expressed will, if upheld, destroy the cogency of the defendants' scheme of boycott; but it leaves them with the safer and more kindly weapons of legitimate persuasion and reasoned argument.' . . .

"We think enough has been said to demonstrate that the common law governing restraints of trade has not been confined, as defendants insist, to the field of commercial activity ordinarily defined as 'trade', but embraces as well the field of the medical profession. And since, as we think, we are required by the decisions of the Supreme Court to look to the common law as the chart by which to determine the class and scope of offenses denounced in Sec. 3, it follows that we must hold that a restraint imposed upon the lawful practice of medicine,—and a fortiori—upon the operation of hospitals and of a lawful organization for the financing of medical services to its members, is just as much in restraint of trade as if it were directed against any other occupation or employment or business. And, of course, the fact that defendants are physicians and medical organizations is of no significance, for Sec. 3 prohibits 'any person' from imposing the proscribed restraints. Congress did not provide that one class, any more than another, might impose restraints or that one class, any more than another, might be subjected to restraint."

After reversal and remand to the trial court, the defendants were convicted of having violated the Sherman Act, as charged in the indictment, and on an appeal from that conviction the same question—whether the practice of medicine was within the meaning of "trade or commerce" as used in the Sherman Act—was again raised. (*American Medical Ass'n* v. *United States*, 130 F.2d 233.) In affirming the conviction, the court stated (p. 236) : "The trade or commerce which was involved in the present case was of three kinds: (1) The making available and financing of medical and hospital services; (2) medical service itself, i.e., service rendered by medical doctors; (3) hospital service, i.e., service rendered by hospital staffs and the use of hospital facilities. As we indicated in our earlier opinion the common law recognized the practice of medicine as being trade . . ."

Certiorari was granted by the Supreme Court of the United States to review the affirmance of the convictions. (*American*

*Medical Asso.* v. *United States,* 317 U.S. 519, 528 [63 S.Ct. 326, 87 L.Ed. 434].) The Supreme Court affirmed the convictions on the ground that restraints of trade were proved under the Sherman Act but expressly reserved opinion as to whether the practice of medicine and the rendering of medical services as described in the indictment are "trade" under section 3 of such act.

Two of the remaining relevant federal court opinions in this area also were rendered in the course of deciding a single case. In this suit the United States brought an action against the Oregon State Medical Society and others to enjoin a conspiracy to monopolize and restrain prepaid medical care or business in the State of Oregon.

In *United States* v. *Oregon State Medical Society,* 95 F. Supp. 103, the district court held that certain Oregon doctors had not violated the Sherman Act in the formation of the Oregon Physicians Service, a doctor-sponsored prepaid medical care plan. The trial court found that the practice of medicine as conducted by the involved physicians is not trade or commerce within the meaning of the Sherman Act. On direct appeal to the United States Supreme Court, the district court decision was affirmed in *United States* v. *Oregon State Medical Soc.,* 343 U.S. 326 [72 S.Ct. 690, 96 L.Ed. 978]. The Supreme Court again found it unnecessary to decide whether the scope of the word "trade" in the Sherman Act extends far enough to include the practice of medicine in the traditional sense. The court stated as follows (p. 336) : "Since no concerted refusal to deal with private health associations has been proved, we need not decide whether it would violate the anti-trust laws. We might observe in passing, however, that there are ethical considerations where the historic direct relationship between patient and physician is involved which are quite different than the usual considerations prevailing in ordinary commercial matters. This Court has recognized that forms of competition usual in the business world may be demoralizing to the ethical standards of a profession."

The sixth federal decision is *Riggall* v. *Washington County Medical Society,* 249 F.2d 266, cert. den. 1958. The plaintiff physician sued the defendant society to recover treble damages for alleged violations of the Sherman Act because of allegedly wrongful refusal to admit him as a member. It was held that his complaint alleging that the practice of his profession as a physician would have been more profitable to him had

the defendant society and its members not deprived him of membership therein, but not alleging that he had been prevented from practicing his profession was insufficient to allege a cause of action under the act.

The Supreme Court of the State of Washington had occasion to consider the general question here presented in *Group Health Cooperative* v. *King County Medical Soc.*, 39 Wn.2d 586 [237 P.2d 737]. This was an action by plaintiff charging defendants with an alleged combination or arrangement in restraint of competition in the field of independent contract medicine and hospital service. In finding certain acts of defendants violative of provisions of the constitution of the state relating to monopolies and trusts, the court stated (p. 765 [237 P.2d]): "As our constitutional provision bespeaks the common law, so it should be permitted to afford the same protection and serve the same broad public interest which is available at common law. Monopolies affecting price or production in essential service trades and professions can be as harmful to the public interest as monopolies in the sale or production of tangible goods. The constitutional provision was designed to safeguard this public interest from whatever direction it may be assailed. The language used must therefore be liberally construed with that end in view."

In *United States* v. *National Asso. R. E. B.*, 339 U.S. 485 [70 S.Ct. 711, 94 L.Ed. 1007], it was held that the adoption by an association of real estate brokers of standard rates for commissions to its members constitutes a conspiracy in restraint of trade within the provisions of section 3 of the Sherman Act although no penalties are imposed by the association for deviations therefrom. At pages 489-490 the court said: "Price-fixing is per se an unreasonable restraint of trade. It is not for the courts to determine whether in particular settings price-fixing serves an honorable or worthy end. An agreement, shown either by adherence to a price schedule or by proof of consensual action fixing the uniform or minimum price, is itself illegal under the Sherman Act, no matter what end it was designed to serve. That is the teaching of an unbroken line of decisions. (Citations.) And the fact that no penalties are imposed for deviations from the price schedules is not material. (Citations.) Subtle influences may be just as effective as the threat or use of formal sanctions to hold people in line."

In holding that the business of a real estate agent consisting largely of the rendition of personal services, is in-

cluded in the word "trade" within the meaning of the act the court at pages 490-492 stated: "The fact that the business involves the sale of personal services rather than commodities does not take it out of the category of 'trade' within the meaning of § 3 of the Act. The Act was aimed at combinations organized and directed to control of the market by suppression of competition 'in the marketing of goods and services.' (Citation.)

"Justice Story in *The Nymph* (CC Me) 1 Sumn. 516, F. Cas. No. 10388, while construing the word 'trade' in the Coasting and Fishery Act of [Feb. 18] 1793, 1 Stat. 305, ch. 8, said,

" 'The argument for the claimant insists, that "trade" is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section. In the first place, the word "trade" is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, *not in the liberal arts or in the learned professions,* it is constantly called a trade. Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a shoemaker, though some of these may be, and sometimes are, carried on without buying or selling goods.' (Italics added.)

"It is in that broad sense that 'trade' is used in the Sherman Act. That has been the consistent holding of the decisions. The fixing of prices and other unreasonable restraints have been consistently condemned in case of services as well as goods. Transportation services (citations), cleaning, dyeing, and renovating wearing apparel (citation), the procurement of medical and hospital services (citation), the furnishing of news or advertising services (citations)—these indicate the range of business activities that have been held to be covered by the Act. In *Atlantic Cleaners & Dyers* v. *United States, supra* (286 U.S. 435, 437, 76 L.ed. 1208, 1209, 52 S.Ct. 607), the Court rejected the view that 'trade' as used in § 3 should be interpreted in the narrow sense which would exclude personal services. It held, speaking through Mr. Justice Sutherland, that § 3 used the word in the broad sense in which Justice Story used it in *The Nymph* (CC Me)

1 Sumn. 516, F. Cas. No. 10388, *supra*. Chief Justice Groner made an extended analysis and summary of the problem in *United States* v. *American Medical Asso.* 72 App.D.C. 12, 110 F.2d 703, 707-711, where the Court of Appeals for the District of Columbia held that the practice of medicine in the District was a 'trade' within the meaning of § 3 of the Act. Its conclusion was that the term included 'all occupations in which men are engaged for a livelihood.' We do not intimate an opinion on the correctness of the application of the term to the professions.''

While the United States Supreme Court, in the foregoing case, again reserved opinion as to application of the term ''trade'' to the professions, it is observed that the analysis of the problem by Chief Justice Groner in the American Medical Association case, *supra,* is specifically and favorably mentioned. In that case at page 709 Justice Groner points out that the italicized portion of Justice Story's opinion in The Nymph case, *''not in the liberal arts or in the learned professions,''* does not compel the conclusion that the Supreme Court has held that the professions are not trades.

In the California case of *Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34 [172 P.2d 867], the Supreme Court considered the question as to whether an alleged combination between a board of fire underwriters and insurance companies, which are members of the board, to stifle competition in the insurance field by dominating the business of insurance agents was an unlawful trust. In finding that it was the court said (p. 44):

''The Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law. Thus, under the common law of this state combinations entered into for the purpose of restraining competition and fixing prices are unlawful. (Citations.) The public interest requires free competition so that prices be not dependent upon an understanding among suppliers of any given commodity, but upon the interplay of the economic forces of supply and demand.''

We are not concerned here with an appeal from a judgment after a trial of the case on its merits. The question before us for determination is whether the respondent court should be directed to enter an order compelling defendants to answer the refused questions.

Whether or not the Cartwright Act may be deemed to apply to the facts presented by the pleadings herein, plaintiff

has sufficiently alleged a purpose on the part of the defendants to restrain competition by him, as well as acts done in pursuance of that purpose to state a cause or causes of action under common law principles. Perhaps some of these acts could be proved by plaintiff without the aid of discovery proceedings but probably the motives and purposes of the defendants could never be. Unless plaintiff is permitted to obtain answers to proper questions he will be deprived of the means of obtaining in advance of the trial information concerning the issues and means of producing at the trial the evidence necessary to sustain his action. A review of the 21 questions which the defendants have refused to answer brings us to the conclusion that the matters, facts and information sought to be elicited thereby are not privileged against disclosure under the law of this state and are relevant as determined by the subject matter of the action and by the potential as well as the actual issues in the case.

Let a writ of mandate issue directing respondent to set aside its order and to make the necessary orders to enable completion of the deposition in accord with the views expressed herein.

Ashburn, Acting P. J., concurred.

HERNDON, J.—I dissent. The majority opinion strongly argues, and apparently holds, that the practice of medicine in California constitutes "trade or commerce" within the meaning of the Cartwright Act. The uncertainty as to what the majority opinion actually holds in this regard stems from the following described aspects thereof:

(1) The opinion discusses and quotes from several federal court decisions which arrive at divergent and conflicting conclusions as to whether or not the practice of medicine is "trade or commerce" within the meaning of the federal anti-monopoly statutes. By its treatment of these and other decisions discussed, the opinion seems to indicate a definite preference for the affirmative view.

(2) However, in the next to the last paragraph in the prevailing opinion it is stated: "Whether or not the Cartwright Act may be deemed to apply to the facts presented by the pleadings herein, plaintiff has sufficiently alleged a purpose on the part of the defendants to restrain competition by him, as well as acts done in pursuance of that purpose to state a cause or causes of action under common law principles."

Does this quoted sentence mean that there exists in California law another basis, apart from the Cartwright Act, upon which to premise liability for the acts of defendants allegedly done pursuant to a purpose "to restrain competition" by plaintiff? Does this reference to unspecified "common law principles" mean that the common law of California reaches further than the Cartwright Act in denouncing combinations entered into for the purpose of restraining competition? Does the majority opinion mean that under the common law of California any association of practitioners is guilty of an unlawful combination if its policies or practices tend in any substantial way to restrict or limit competition or to fix fees to be charged in the practice of any of the learned professions? Or does the opinion here have reference only to some of those more recently developed concepts having to do with the protection of the so-called "interest in freedom from concerted interference with advantageous business relationships?"

It is my understanding that the Cartwright Act was intended to constitute a complete embodiment of the common law of California on the subject of unlawful combinations in restraint of trade and competition. In *Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 44 [172 P.2d 867], the court observed that "[t]he Cartwright Act merely articulates in greater detail a public policy against restraint of trade that has long been recognized at common law." Any rules of the common law at variance or inconsistent with the intent and policy of California statutes are deemed to be superseded and are not the law of this state. (*Monterey Club* v. *Superior Court,* 48 Cal.App.2d 131, 145 [119 P.2d 349].) In the last cited case, the appellate court rejected common law definitions of a public nuisance, and citing *People* v. *Lim,* 18 Cal.2d 872 [118 P.2d 472], concluded that any action in California to abate a nuisance "must be predicated upon the statutes of this state rather than upon the common-law definition of 'public nuisance.'" (*Monterey Club* v. *Superior Court, supra,* at p. 144.)

In further support of its holding that the definitions of a public nuisance contained in our Civil Code operated to supersede common law definitions, the court referred to section 4 of the Civil Code which provides: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates,

and its provisions are to be liberally construed with a view to effect its objects and to promote justice."

Accordingly, I would regard as erroneous a holding that the common law of California reaches further than the provisions of the Cartwright Act with respect to combinations in restraint of trade.

The Sherman Act also is described as an embodiment or restatement of the common law. (*Apex Hosiery Co.* v. *Leader,* 310 U.S. 469, 498 [60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044]; see also *Rolley, Inc.* v. *Merle Norman Cosmetics,* 129 Cal.App.2d 844, 849 [278 P.2d 63, 282 P.2d 991].) The Supreme Court of the United States has twice expressly declined to hold that the practice of medicine constitutes "trade or commerce" within the meaning of that statute. (*American Medical Association* v. *United States,* 317 U.S. 519, 528 [63 S.Ct. 326, 87 L.Ed. 434]; *United States* v. *Oregon State Medical Society,* 343 U.S. 326, 336 [72 S.Ct. 690, 96 L.Ed. 978].)

Since no California decisions have been reported which discuss the application of the Cartwright Act to the practice of the so-called learned professions, I agree that it is entirely appropriate to consider the decisions of the federal courts dealing with the application of the federal antitrust laws. However, I would not concede that such federal decisions would necessarily be controlling in determining the proper construction of the California statute.

In *United States* v. *National Asso. Real Estate Boards,* 339 U.S. 485, 490 [70 S.Ct. 711, 94 L.Ed. 1007], in an opinion by Mr. Justice Douglas, the coverage of the word "trade" as it appears in the Sherman Act is defined as follows:

"Justice Story in *The Nymph* [(CC Me) 1 Summ. 516, F. Cas. No. 10388] 18 Fed.Cas. 506, while construing the word 'trade' in the Coasting and Fishery Act of [Feb 18] 1793, 1 Stat. 305, [ch 8], said,

" 'The argument for the claimant insists, that "trade" is here used in its most restrictive sense, and as equivalent to traffic in goods, or buying and selling in commerce or exchange. But I am clearly of opinion, that such is not the true sense of the word, as used in the 32d section. In the first place, the word "trade" is often, and indeed generally, used in a broader sense, as equivalent to occupation, employment, or business, whether manual or mercantile. Wherever any occupation, employment, or business is carried on for the purpose of profit, or gain, or a livelihood, *not in the liberal arts or in*

*the learned professions,* it is constantly called a trade. Thus, we constantly speak of the art, mystery, or trade of a housewright, a shipwright, a tailor, a blacksmith, and a shoemaker, though some of these may be, and sometimes are, carried on without buying or selling goods.' " (Emphasis added.)

As the majority opinion indicates, three of the six relevant federal court decisions therein discussed dealt with an alleged conspiracy to hinder and obstruct the business operations of an organization called "The Group Health Association, Inc." There was no charge of monopoly, restraint of competition or price fixing in the practice of medicine as such. Group Health was a commercial enterprise engaged in the business of providing medical care and hospitalization on a prepayment basis. In a very real sense, the association was in the insurance business. To hold that interference with the activities of such a commercial enterprise amounts to a restraint upon trade or commerce quite obviously is a far cry from holding that the traditional practice of medicine is "trade" within the meaning of the statute.

The majority opinion places great reliance upon the decisions of the Court of Appeals for the District of Columbia in *United States* v. *American Medical Association,* 72 App.D.C. 12 [110 F.2d 703], and *American Medical Association* v. *United States,* 130 F.2d 233. It must be remembered, however, that the language of those decisions so extensively quoted in the majority opinion was expressly and pointedly denied the benefit of sanction by the United States Supreme Court in *American Medical Association* v. *United States, supra,* 317 U.S. 519, 528, and *United States* v. *Oregon State Medical Society, supra,* 343 U.S. 326, 336.

It is further to be noted that Chief Judge Groner in his decision in the American Medical Association cases relied heavily upon the English case of *Pratt* v. *British Medical Association* [1919] 1 K.B. 244. The opinion in that case was written by McCardie, J., presiding in a court of first instance. It appears that the gravamen of the defendants' conduct in that case was their alleged conspiracy to destroy the Coventry Dispensary, an institution which provided its members with medical attendance, medicines, etc., in return for their annual dues. The doctors on the staff of the dispensary were compensated by allowing them a specified share of the funds derived from the dues of members. This was described as "contract practice." Hence, it is apparent that the Coventry Dispensary was essentially the same in character and purpose

as the Group Health Association involved in the American Medical Association cases.

In this connection it seems fair to observe that the policy of the English law as declared by McCardie, J., in 1918, is no reliable guide in searching for the intent of the California Legislature when it enacted the Cartwright Act in 1907. The policy of twentieth century English law has embraced many socialistic concepts which have not yet gained general acceptance in this country.

A more authoritative and more recent English decision is that of the Judicial Committee of the Privy Council in *Thompson* v. *British Medical Association* [1924] A.C. 764. This decision sustained the Supreme Court of New South Wales in reversing a judgment against the New South Wales branch of the British Medical Association and certain of its officers for the sum of £2000. This sum had been awarded the plaintiff doctor upon a jury verdict by way of damages which he claimed to have suffered as a consequence of his expulsion from the association and an ensuing boycott by its members. The general nature of his complaint is indicated by the following quotation from the opinion rendered by Lord Atkinson:

"In the first count of the declaration the plaintiff alleges that the defendant association maliciously and unjustifiably conspired and combined with certain of its members whose names were unknown to him to do certain things. These things were (1.) to pass a resolution for his expulsion, (2.) to expel him, (3.) to induce, persuade and procure medical practitioners members of the associations to refuse to meet him in consultation or to accord him professional recognition in any other form, (4.) to intimidate, coerce and unduly influence such practitioners into refusing to meet him in consultation or to accord him professional recognition in any other form, and (5.) to seriously prejudice the plaintiff and injure his practice. The count goes on to allege that each of these objects was carried out in pursuance of this conspiracy and combination, as a consequence of which the plaintiff suffered damage."

The remaining four counts of the complaint charged other wrongful acts including coercion, intimidation, defamation, etc. In support of his action, the plaintiff relied strongly upon his contention that the following regulations of the society were illegal:

"(1) Where any member shall have been expelled he shall

not be met in consultation or accorded professional recognition in any other form by any member until it shall have been otherwise decided by the council. (2) Where any medical practitioner shall have been declared by the Council (a) To have been guilty of conduct detrimental to the honour and interests of the profession and calculated to bring the profession into disrepute, or (b) to have grossly contravened the custom of the medical profession, or (c) to have acted detrimentally to the interests of the association or omitted to comply with any of its rules or resolutions; no member shall consult with or extend professional recognition in any form to such practitioner until it shall have been otherwise decided by the council.''

In rejecting this contention, their Lordships declared:

''During the argument it was persistently urged that this regulation operated in general restraint of trade and was therefore void. That involves a misuse of language. Even if it did so operate it would not be void at common law but merely unenforceable at law, while under ss. 3 and 4 of the Trades Union Act, 1871, it would be valid at law, but not directly enforceable: *Joseph Evans & Co.* v. *Heathcote.*[1] But the more important consideration is this, that this regulation was framed long before the appellant became a member. It was not specially directed at him. The respondents have not attempted to enforce it in any way whatever. It is not designed to coerce. It can only coerce—if coerce at all—members of the association. People who never were members, or, like Dr. Thompson, were members, but have ceased to be so, may snap their fingers at the association, and as far as that body is concerned meet in consultation with any one they please. The object of the rule is, in their Lordships' view, not to penalize or impoverish or injure Dr. Thompson, or any former member, but solely to keep up the discipline of and 'moral' of the members of the association to protect and promote its interests, though indirectly and as an entirely undesigned result some injury may incidentally be sustained by an expelled member in the practice of his profession. The difference between two such intentions is well established in trade competition. A trader may deliberately with the object of securing and developing his trade, by advertisement, lowering of prices or suchlike means, do something which may result in injuring the trade of a rival trader, but if that be not the designed

---

[1] [1918] 1 K.B. 418.

and intended results of the first trader's action, but only an undesigned incidental consequence of it, the first trader is blameless. The well-known case of *Mogul Steamship Co.*[2] establishes this distinctly."

Returning now from this digression into British law, reference will be made to more recent decisions of the federal courts of the United States which tend to contradict those relied upon in the majority opinion.

In *United States* v. *Oregon State Medical Society*, 95 F. Supp. 103, 118, the United States District Court held that an association of Oregon doctors had not violated the Sherman Act in the formation and operation of Oregon Physicians Service, a doctor-sponsored plan for prepaid medical care. It is a significant fact that in this case the court was dealing with activities beyond the scope of the traditional practice of medicine. Nevertheless, the court held that these activities did not constitute "trade" within the coverage of the Sherman Act. The court expressly posed the question: "Are the professions exempt from the Sherman Act?" The court declared its conclusion in this language: "The practice of medicine as conducted within the state of Oregon by doctors of Oregon, including defendants, is not trade or commerce within the meaning of section 1 of the Sherman Anti-trust Law, . . ."

This decision was affirmed on direct appeal to the United States Supreme Court in *United States* v. *Oregon State Medical Society, supra*, 343 U.S. 326, 336. In this decision the Supreme Court again found it unnecessary to decide whether the word "trade" in the Sherman Act comprehends the practice of medicine. The language of the court in that regard is as follows:

"Since no concerted refusal to deal with private health associations has been proved, we need not decide whether it would violate the anti-trust laws. We might observe in passing, however, that there are ethical considerations where the historic direct relationship between patient and physician is involved which are quite different than the usual consideration prevailing in ordinary commercial matters. *This Court has recognized that forms of competition usual in the business world may be demoralizing to the ethical standards of a profession. Semler* v. *Oregon State Board of Dental Examiners*, 294 U.S. 608, 79 L.Ed. 1086, 55 S.Ct. 570." (Emphasis added.)

---

[2] [1892] A.C. 25.

The pointed distinction between professional and commercial relationships which is made in the foregoing language seems highly significant, and might reasonably be regarded as an indication of the court's leaning with respect to the question reserved.

The *most recent* federal decision, and one involving a complaint in substance very similar to the complaint of the petitioner in the case at bar, was rendered by the United States Court of Appeals for the Eighth Circuit in *Riggall* v. *Washington County Medical Society*, 249 F.2d 266 (cert. denied March 3, 1958; 355 U.S. 954 [78 S.Ct. 540, 2 L.Ed.2d 530]). In that case, the plaintiff doctor sought to recover damages from the County Medical Society of Washington County, Arkansas. He alleged that he was in all respects qualified for membership in the Society, but that notwithstanding such qualifications, his applications for membership in due form were rejected on four different occasions; that his applications had been wrongfully, capriciously and arbitrarily rejected; that because of these denials of membership, he had been and was prevented from doing a number of enumerated things, all of which had been of great economic benefit and importance to him as well as to his patients and the public and society in general, and that the defendants had combined and conspired to commit various acts amounting to violations of the Sherman Anti-Trust Act. He prayed for compensatory damages in the sum of $100,000; for treble damages; for an injunction and for other specific relief.

The federal district court dismissed the complaint, holding that it failed to state a cause of action. In affirming the judgment of dismissal, the Court of Appeals cited and quoted with approval the opinion of the District Court of Oregon in *United States* v. *Oregon State Medical Society, supra*, 95 F. Supp. 103. The following is the concluding paragraph of the opinion:

"As has been observed, plaintiff's complaint in substance is that the practice of his profession would have been more profitable to him had the defendants not deprived him of membership in the Washington County Medical Society. Plaintiff was not prevented from practicing his profession and the complaint, we think, is wholly lacking in allegations essential to a cause of action under the Sherman Anti-Trust Act." (*Riggall* v. *Washington County Medical Society*, 249 F.2d 266, 270.)

*In summary, it seems fair to say that the greater weight*

*of federal authority favors the conclusion that the tradi-
tional practice of medicine in particular, and the practice
of the learned professions generally, do not constitute "trade
or commerce" within the meaning of the Sherman Act.* The
above quoted language of Justice Jackson in *United States*
v. *Oregon State Medical Society, supra,* 343 U.S. 326, seems
at the very least to suggest a leaning in favor of this con-
clusion.

*But even had the federal courts come to the opposite con-
clusion, there would still have remained other reasonable and
sufficient grounds to support the view that the Cartwright
Act was intended to exclude the learned professions from
the coverage of its provisions.*

In the first place, the words and phrases of California
statutes generally "are construed according to the context and
the approved usage of the language." (Civ. Code, § 13; Code
Civ. Proc. § 16; Pol. Code, § 16.) In modern usage of the
English language in the United States the word "trade"
does not generally connote the practice of the learned pro-
fessions. In the second place, our Business and Professions
Code evidences a conscious legislative recognition of the
distinctions which we make here. When the Legislature has
intended to include the professions within the scope of regu-
latory statutes, it has made that intention clear by the use
of appropriate language.

Section 16600 of the Business and Professions Code,[3]
which codifies the law relating to *restrictive covenants,* is
made expressly applicable to a *"profession"* as well as to a
*"trade"* or *"business."* Section 1673 of the Civil Code, the
statutory antecedent of section 16600, was enacted in 1872.
The Cartwright Act, which codifies the law relative to *"com-
binations in Restraint of Trade,"* was not enacted until 1907.
It seems to be a matter of some significance, therefore, that
it does not use the word "profession" in defining the scope
of its coverage.

This difference in legislative treatment of restrictive cove-
nants and restraint of trade was undoubtedly intentional. It
indicates an awareness of the fact that the common law rules
relating to ancillary covenants not to compete were based
upon different considerations of public policy from those
which motivated the more recent development of rules de-

---

[3] § 16600. *"Invalidity of contracts.* Except as provided in this chapter,
every contract by which anyone is restrained from engaging in a lawful
profession, trade, or business of any kind is to that extent void."

nouncing monopolies, restraint of trade, price fixing and the like. The ancient law of covenants was based largely on the view that an agreement not to compete imposed a form of servitude on the individual promisor. Such covenants unless reasonably restricted in duration and territorial scope were held to be void. The modern anti-trust laws are premised upon very different considerations and very different purposes. (See *Apex Hosiery Co.* v. *Leader,* 310 U.S. 469 [60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044].)

The exemption of members of the learned professions and their associations from the regulatory prohibitions of state and federal statutes denouncing restrictions upon competition, price fixing, and the like, does not place them in any unique or "most-favored" position. It is common knowledge that labor organizations have been expressly exempted from the application of these laws. On the basis of these exemptions, numerous other immunities have accrued to labor organizations, and these immunities are rationalized by implications drawn from the declared and assumed reasons underlying the exemption. It seems to me that substantially the same immunities in favor of the professions may be implied by a similar process of reasoning.

As to the effectiveness of the exemption as a basis for other immunities logically to be implied therefrom, it seems to me to make no difference that in the one case, (that of labor organizations) the exemption was effected by an express exclusionary clause limiting the general coverage, whereas in the other case (that of the professions) it was effected by the use of language of coverage designed to exclude them. The situation is somewhat analogous to the mechanics involved in drafting a contract of insurance. If the purpose is to exclude certain risks, it may be accomplished in either of two ways. The language affirmatively defining coverage may be so chosen that it will not include the risks not intended to be covered. Or, if the language used to define coverage might include them, they may be excluded by express words of limitation or exclusion. Assuming the use of appropriate language, the result should be precisely the same, whichever method is used.

In addition to the considerations underlying the policy of exempting the professions from laws denunciatory of price fixing and of restrictions upon competition suggested by the decisions above discussed, there are, I think, other substantial reasons which logically entitle the professions to

some of the same immunities which have been accorded to labor organizations. I have particularly in mind the immunities from liability for concerted refusal to deal and from liability for concerted interference with contracts and other advantageous economic relationships. (See *Imperial Ice Co.* v. *Rossier*, 18 Cal.2d 33, 35 [112 P.2d 631]; *Los Angeles Pie Bakers Association* v. *Bakery Drivers*, 122 Cal.App.2d 237, 243 [264 P.2d 615], and cases cited.) I shall attempt hereinafter to set forth some of these additional reasons.

One of the emphasized allegations of petitioner's complaint in the case at bar is that the defendants are engaged in a conspiracy to fix prices. Indeed, petitioner in paragraph XLII of his complaint assigns as the true reasons for the rejection of his application for membership in the defendant association the following:

## "XLII.

"That plaintiff has at all times charged members of the public for medical treatment in his offices rates lower than those prescribed as minimum rates, by the Los ANGELES COUNTY MEDICAL ASSOCIATION for its members; that plaintiff's charges have not conformed to the mathematical formula-type charges endorsed by the CALIFORNIA MEDICAL ASSOCIATION, the non-observance of which, as hereinabove set forth, THE CALIFORNIA MEDICAL ASSOCIATION has stated would constitute the basis of disciplinary action by the Los ANGELES COUNTY MEDICAL ASSOCIATION: that plaintiff further made his services available to the public during a greater number of hours per day and a greater number of days per week than did the members of the said association practicing in his community; that as a condition for admission into the said association, plaintiff would have been required to conform to the standards for fees and hours prescribed by the associations; that acceptance of these conditions would have been the domination of the medical practice and the profession and business of the plaintiff by the defendants."

Yet the promulgation, publication, use and enforcement of minimum fee schedules for professional services has been common in many parts of the country for nearly a century. (See Marcus, *Civil Rights and the Antitrust Laws*, 18 U.Chi. L.Rev. 171, 201-202, citing public announcements of minimum fee schedules for medical services in Alabama, Illinois, Michigan, Nebraska, New Hampshire, New Jersey, Pennsylvania, South Carolina, and the District of Columbia; see

also *Rohlf* v. *Kasemeier*, 140 Iowa 182 [118 N.W. 276].) The minimum fee schedules of local bar associations are constantly being revised and republished in the legal journals of California.

With respect to charges of price fixing and the taking of measures designed to restrict competition, it should be borne in mind that the professions are given certain monopolistic privileges in return for their submission and adherence to legally prescribed standards and regulations. As a corollary to these privileges, the professions are expected to police themselves and to maintain the highest standards of ethics. Not the least important among these ethical requirements are those which relate to the reasonableness of fees and of the duty to render their services to the indigent.

In every state of the union associations of lawyers and doctors are engaged in concerted efforts to discourage or prohibit advertising and unauthorized practice and otherwise to limit and discourage commercialism and competition. I would not be inclined to question the right of a local bar association to reject the membership application of a lawyer known as one who sought to increase his clientele by consistently cutting his fees below those set by its minimum schedule (or below the standards of the statutory fees set by the Probate Code).

My conclusion is that petitioner has stated no cause of action under the Cartwright Act, or under any other law or theory suggested by him. In so concluding, I accept the premise stated in the majority opinion that "[t]he basic issue presented by the pleadings in the instant case is the existence or nonexistence of a combination by the named defendants to restrain competition by the plaintiff." My conclusion in this regard is substantially supported by the decision in *Riggall* v. *Washington County Medical Society, supra*, 249 F.2d 266, cert. denied, 355 U.S. 954 [78 S.Ct. 540, 2 L.Ed.2d 530].

But even if I were compelled to concede that a cause of action had been stated, or might be stated on the general state of facts as represented, I would still vote to deny the writ for two reasons: (1) to grant the writ is to deny the trial court the essential power reasonably to control discovery procedures through the exercise of a sound discretion; and (2) any questions or papers relating to the reasons which motivated the rejection of petitioner's membership application are not rele-

vant or material to any substantial triable issue. I shall discuss these two points in order.

The majority opinion alludes to the greater "liberality" of the new rules which are designed to facilitate pretrial discovery. It is devoutly to be hoped that these new rules will prove fully as salutary as their most ardent advocates expect them to be. There may be some basis, however, for the apprehension of those who fear that the new rules are susceptible of being abused and misused for purposes of annoyance and harassment. To my mind, the key to this situation is the exercise of a proper control by the trial court.[4] If this control is to be effectively exercised, a substantial area of discretion must be vouchsafed to the trial judges. Indeed, the language of section 2019, subdivision (b) of the Code of Civil Procedure seems clearly intended to vest the court with a broad discretion in limiting and regulating the use of discovery procedures.

Every lawyer who is familiar with discovery practice under the Federal Rules of Civil Procedure will testify to the importance of adequate and reasonable control by the trial court. Although the federal rules are generally regarded as salutary in effect, it is well known that they have been grossly abused with resultant injustices of a most serious character in cases where adequate control has not been exercised.

It is an established rule that the extraordinary writ of mandamus is not available as a matter of law, but the issuance thereof rests solely within the discretion of the court to which application is made. The right to the writ must be clear and certain since its purpose is to prevent a failure of justice. (*Irvine* v. *Gibson,* 19 Cal.2d 14, 15-16 [118 P.2d 812].) The writ of mandate is not designed and should not be utilized to unduly control and circumscribe the rulings of trial courts. In matters involving discretion, the writ will not lie to control the exercise of such discretion "except in those rare instances where under the facts it cannot be exercised in but one way." (*Monroe* v. *Superior Court,* 97 Cal.App.2d 470, 472 [218 P.2d 136].)

On the question whether the writ of mandamus should issue to compel the lower court to uphold the right of a party to an action to take depositions, to have questions answered, and

---

[4] "'In view of the wide discretion vested in trial judges to protect against abuse, as well as to enforce discovery, the significance of an able trial bench to sound and just judicial administration is further emphasized.'" (Louisell, *Discovery Today,* 45 Cal.L.Rev. 486, 514.)

documents produced, the California cases divide into two groups. In one category are those in which the trial court has refused to compel a witness or a party to complete his deposition, to answer questions that clearly appear to be proper, or to produce documents clearly appearing to be relevant and material. In the other category are those in which the trial court properly has exercised a reasonable control. (*McClatchy Newspapers* v. *Superior Court*, 26 Cal.2d 386, 393 [159 P.2d 944].) Where the trial court has acted in such a manner as to deny the right of a party to take depositions and to use subpoenas, its action may be directed by mandamus. (*I.E.S. Corp.* v. *Superior Court*, 44 Cal.2d 559 [283 P.2d 700] ; *Zellerbach* v. *Superior Court*, 3 Cal.App.2d 49 [39 P.2d 252].) However, while ordinarily a party is entitled to the taking of a deposition, or to the use of a subpoena as a matter of right, at any time after service of summons or appearance of the defendants, the exercise of that right is subject to a reasonable control by the trial court, and under appropriate circumstances may be denied. (*Hays* v. *Superior Court*, 16 Cal.2d 260, 264 [105 P.2d 975] ; *Patrick Farms, Inc.* v. *Superior Court*, 13 Cal.App.2d 424, 425-426 [56 P.2d 1283].)

The absolute right of the medical association to reject petitioner's application for membership for any reason, good or bad, being expressly conceded, I fail to see the relevancy or materiality of the hoped-for evidence to any substantial issue, either existing or potential. But assuming the existence of the issue and the relevancy and materiality of the evidence, its pretrial discovery would seem to be relatively unimportant to the development of petitioner's case. This evidence would have no bearing whatsoever upon any of the numerous other more basic and essential issues of fact tendered by the allegations of petitioner's complaint. If the petitioner proves to be able to make out a substantial case, and if, in the context of the evidence developed at the trial, it appears to the trial judge that the questions now before us are properly directed to a material issue essential to the just determination of the cause, it will not be too late to require the witness to answer and to compel disclosure of the contents of the membership file.

It may be conceded that the files of the medical association relating to applications for membership are not "privileged" in the strict sense of that term. But that concession does not detract from the validity of the rule of policy which the

association seeks to invoke on the authority of *Runyon* v. *Board of Prison Terms and Paroles*, 26 Cal.App.2d 183 [79 P.2d 101], namely, that the confidential nature of the contents of such files should be recognized and respected. The law should not compel the disclosure thereof in violation of clearly implied confidences except for cogent and satisfactory reasons. The trial judge will be in the best position to determine the necessity and propriety of requiring a disclosure and to evaluate the conflicting interests involved. I cannot see that the petitioner would be materially prejudiced by deferring the determination to that stage of the proceeding.

In short, I think the trial court has properly exercised its discretion in this matter. I would deny the writ of mandate.

The petitions of respondent and real parties in interest for a hearing by the Supreme Court were denied July 16, 1958. Schauer, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.